**Henry L. LAKIN, Appellant,**

v.

**POSTAL LIFE AND CASUALTY INSURANCE COMPANY, a Corporation, Respondent.**

**No. 46075.**

Supreme Court of Missouri,

Division No. 2.

Oct. 13, 1958.

Donald G. Stubbs, McKenzie, Williams, Merrick, Beamer & Stubbs, Kansas City, for appellant.

James A. Moore, Jess W. Van Ert, Laird P. Bowman, Kansas City, for respondent Gage, Hillix, Moore & Park, Kansas City, of counsel.

STOCKARD, Commissioner.

Appellant Henry L. Lakin instituted this action April 18, 1955, against Postal Life and Casualty Insurance Company to recover the face amount of $25,000 and interest on a policy of insurance dated October 13, 1954, on the life of W. Harvey Hankinson, appellant's alleged business partner, and for the statutory allowance for vexatious refusal to pay and for attorneys' fees. Respondent admitted the issuance of the policy, a change of beneficiary and an assignment to appellant in form only, and it based its defense on the submitted grounds that said policy was invalid (1) because appellant had no insurable interest in the life of the insured and sought to evade the law against wagering insurance contracts; (2) because of false representations in the procurement of the policy; and (3) that appellant intentionally took the life of said insured and is not entitled to receive the proceeds of said policy. Judgment was entered for respondent on the unanimous jury verdict. Appellant contends reversible error resulted in not directing a verdict for him for the face amount of the policy, plus interest, as requested at the close of the evidence, and in giving respondent's instructions Nos. 3, 7 and 8.

This is a reassigned case. A rather detailed statement of the facts will be made, perhaps more detailed than necessary for the disposition required. However, a complete picture of the facts as disclosed by the evidence is believed advisable as well as helpful.

Appellant was a small roofing and siding contractor in Kansas City with his office located in his home. He placed the following advertisement in the "help wanted" sections of the Kansas City Star and Kansas City Times of August 19, 1954: "Man—Age 25 to 30, single, start as helper and learn trade; wages plus room and board; prefer person with no family ties. CL 7446."

W. Harvey Hankinson was a native of Gloverville, South Carolina. After he was discharged from military service in 1949 he returned to Gloverville and worked as an auto mechanic in his father's garage and also operated a wood and coal business. He abandoned his wife and four children in the early part of 1954. From August 9 to August 19, 1954, he was a patient in the Veterans Hospital at Kansas City. He had worked in the kitchen of a railroad section gang just prior thereto. Earl Hankinson, Harvey's brother, testified that after Harvey's release from the army his "business went bad" because he started drinking, that his drinking came "before anything else" and that he was "a drunkard, a derelict and a floater." He also testified that Harvey had permitted his National Service Life (G.I.) insurance to lapse for nonpayment of premiums.

Appellant testified that Hankinson responded by telephone to the above newspaper advertisement, and that he met him at a drug store near the hospital and "selected" him "to work for me at the time." Hankinson had no place to stay, and appellant took him to his home where he thereafter lived. Appellant also stated that Hankinson worked "the first job or two for nothing, that was to learn the trade, see if he liked it and all, he got his room and board out of it." This arrangement lasted about a week. Although appellant testified that he paid Hankinson a weekly sum "for awhile," he also stated that he never gave him a definite amount each week because the payments were based on piece work and job work. According to appellant, Hankinson was a willing worker and "caught on to things;" they were friendly; talked about the busi-

ness and about joining as partners; and that they entered into a percentage arrangement under which Hankinson's share "grew very rapidly" and he was drawing from forty-five to fifty or fifty-five per cent at the time of his death. Also, appellant stated that if Hankinson "needed an advance of money I would give him advance money. We didn't argue much about the money." However, appellant kept no books showing the amount of those "advances." Hankinson's name never appeared on any letterheads, business cards, invoices, or in any contract. Appellant had no written agreement with him, and they never used a partnership name because "we hadn't got to that." Hankinson made no capital contribution whatever to the alleged partnership, and he did not buy any share in appellant's equipment. Appellant kept no accounting books, but he maintained what he called a "job analysis sheet." The partnership maintained no bank account and all checks for work done were payable to appellant alone and were deposited to his credit. Hankinson had no right to issue checks, and he did not hire or fire any employees. Appellant testified that he filed a Lakin & Hankinson partnership income tax return for the year 1954 about four weeks prior to the trial. This meant that the return was filed about twenty-two months after Hankinson's death and about eighteen or nineteen months after it was due. Following the death of Hankinson, appellant made no settlement of partnership interests.

Appellant testified that he previously had had three partners. One of these alleged partnerships was with a person named Shelton but it did not last "over about six weeks." Another was with a person named Dummit and it lasted "less than a month." The other alleged partnership was with Frederick E. Scott. Appellant stated that this partnership lasted "about three years, all told," but that he had no written agreement with Scott. According to appellant the percentage division between him and Scott was "fifty percent," but he also testified to a most unusual arrangement whereby Scott "gave" all of his share of the money back to appellant, because, according to appellant, "he wouldn't take it," and then appellant gave Scott "what he needed." Scott also lived at appellant's house as did Shelton.

On applications, dated September 5, 1951, signed by Scott and by appellant stating their relationship as partners, the Prudential Insurance Company of America issued separate $25,000 ten-year term policies, with double accidental death benefits, on the life of Scott with appellant as beneficiary and on the life of appellant with Scott as beneficiary. Scott testified that he thought appellant's wife was designated as beneficiary in appellant's policy and that he did not remember seeing the policies or paying any premiums on them. He testified that he quit working for appellant following an attack upon him by appellant with an iron pipe. However, he also admitted that he stayed at appellant's house several months after the attack because he had no money to leave and that he left shortly after he had a wreck with appellant's car. There was no settlement of partnership interests when Scott left.

Appellant also testified that his brother had been a partner with him during 1956 for five months, but that "right now he is not a partner with me" because he was "out selling."

Appellant filed no partnership income tax returns for any of his partnerships prior to his alleged partnership with Hankinson because, as he stated, "there was no partnership with me." There is no explanation of this obviously inconsistent statement.

In the course of his testimony, appellant stated that he was a "believer" in insurance and carried approximately $80,000 on his own life. He admitted that he was influential in Hankinson's becoming interested in insurance. Tom Ballard, an agent for Pru-

dential Insurance Company, and appellant were good friends. Appellant told Ballard that he had a new partner, and on August 26, 1954, which was only seven days after appellant placed the advertisement in the newspapers which Hankinson answered, Ballard took Hankinson's application for a $50,000 ten-year term double indemnity policy in which appellant as "partner" was designated as beneficiary. Prudential wrote Ballard and requested his justification for this application, and he answered on September 20, 1954, that the partners had agreed that Hankinson was to receive 25% of the profits while learning the business and that Hankinson had stated he had invested $5,000 in the business. Both of these statements, according to the testimony of appellant, were untrue. Ballard then made the request to Prudential that if it would not issue a $50,000 policy it consider issuing a $25,000 policy. Prudential rejected the application.

Dayton Ballard, Tom's brother, was also an agent for Prudential and had a soliciting agent's contract with respondent. Tom informed Dayton that Prudential had rejected the application for insurance which he had submitted, and he asked Dayton if there was "a possible chance" of placing the insurance with respondent. On October 12, 1954, Tom and Dayton Ballard met appellant and Hankinson at appellant's home. When advised that Hankinson had four children but no insurance, Dayton suggested that Hankinson submit to respondent an application for a five-year term policy in the amount of $25,000, with double indemnity, with his wife designated as beneficiary. He explained that since Hankinson's application to Prudential had been rejected the premium would be rated up, and that if respondent issued the policy he would then ask for "business insurance" in the amount of $25,000.

Hankinson executed an application as Dayton suggested, and he obtained the $58.-75 quarterly premium from appellant in cash and handed it to Dayton. Dayton wrote in the answers to the questions on the application, and stated, among other things, that Hankinson's age was thirty and that he had been a partner with appellant for two months. The answer "No" was made to the question, "Have you ever been refused insurance or been granted insurance under special conditions such as being charged an extra premium or rated up in age?" Dayton testified that if he wrote this answer "it was certainly a mistake" because he knew that Prudential had previously rejected Hankinson's application. A handwriting expert testified that this answer was written by the same person who wrote the other answers and which Dayton admitted were written by him.

On the reverse side of the application Dayton stated that he had known Hankinson one week; that Hankinson's financial worth was $10,000; that his net income from his business was $10,000; and that he had always been a person of good habits and reputation. He testified that these answers were given to him by Hankinson and that he made no other inquiries with respect thereto. The answers concerning financial worth and income unquestionably were false.

Dayton delivered this application to Eugene W. Christy, city manager for respondent, and he stated to Christy that if the policy was issued, a $25,000 "business policy" would then be requested; that if he could only get a $25,000 policy he would ask the company to honor a change of beneficiary to Hankinson's business partner as the parties were primarily interested in "business insurance." Dayton testified that at Christy's suggestion he added to the application the note, "Please issue an additional $25,000 5-year term on quarterly basis—same benef. etc.—." He did not explain why he requested that Hankinson's wife should be designated as beneficiary in this "business insurance" policy.

Answers to questions on the medical examination, purportedly made by Hankinson, were that he had never had an application

for life or health insurance rejected; he had never been in a hospital, sanitarium, asylum or other institution for treatment, care or observation except for the extraction of two teeth in 1954; he had never had any disease, injury or illness; and he had not consulted a physician or practitioner during the seven years prior to his application. These answers were false.

Upon being informed by respondent that it would issue only one $25,000 policy, and that the premium would be up-rated, apparently because of Hankinson's drinking habits, Dayton Ballard called appellant and informed him of this situation, and as a result of this conversation with appellant (he did not talk to Hankinson), he called Christy and told him "to go ahead and have it issued and see if I could place it."

Instead of the policy requested respondent mailed to Dayton Ballard an endowment policy in the amount of $25,000, with no double indemnity, at age eighty-five, dated October 13, 1954, with "Margaret B. Hankinson, wife of insured" named as beneficiary in case of insured's death before maturity. The premium was up-rated to "Table 10" which resulted in the quarterly premium being $276.63. Dayton Ballard, testifying as appellant's witness, stated that he then took the policy, and in the presence of appellant, "showed it to Mr. Hankinson and he [Hankinson] said the premium was too high, he didn't want it." Ballard then discussed the question of "business insurance," and after some discussion, "Mr. Lakin [appellant] took it as business insurance." Appellant personally paid the additional $217.88 in cash, which with the $58.75 he had previously paid, equalled the first quarterly premium on this endowment policy. "Right away" Dayton Ballard obtained the forms to change the ownership and beneficiary of the policy, and they were executed by Hankinson on November 29, 1954. Like forms were executed by appellant for the substitution of Hankinson as beneficiary in the $25,000 policy issued by Prudential on the life

of appellant in which Frederick E. Scott had originally been named as beneficiary. Dayton Ballard delivered the two policies, with the requested endorsements, at appellant's home to Mrs. Lakin and to Hankinson, appellant being away at the time. This was the only occasion when the insurance was discussed that appellant was not present.

Appellant testified that neither he nor Hankinson was going to pay the premium that was due on January 13, 1955, on the policy issued by respondent. The record does not reveal whether the policy with Prudential in which Scott was originally designated beneficiary and which was changed to Hankinson was kept in effect. The degree to which appellant was a "believer" in insurance is revealed by the following facts: It was estimated by Tom Ballard that the premiums on appellant's $80,000 of insurance totaled approximately $100 a month. The premium on the policy with respondent on the life of Hankinson was $92.21 a month. The individual income tax return of appellant for the year 1954 reveals that his income amounted to $1,530.84 from "business profit;" $1,338.16 from "partnership profit;" $477 net from rentals; or a total income of $3,346. His total deductions amounted to $488.63 leaving a total income after authorized deductions of $2,857.37. Authorized personal and family exemptions then reduced the taxable income to $457.37. We note that in the Lakin and Hankinson partnership return for 1954 the total gross income was listed as $3,034.23 and the total deductions were $488 for "commissions paid" and $29.43 for "Fr't and Drayage." In other words, insurance premiums were not deducted as a partnership expense, and therefore, the item of $1,338.16 on appellant's individual income tax return had not been reduced by the payment of any insurance premiums. By accepting appellant's figures, we find that when he took the $25,000 policy on the life of Hankinson his annual obligation for insurance premiums was approximately $800 less than his total net taxable income

for the calendar year of 1954 before his authorized family exemptions for himself, his wife and two children. In 1955 appellant's total net income was $2,624.85 before family exemptions.

Hankinson met his death on January 17, 1955, within the thirty-day grace period provided for in the policy, while he and appellant were on a hunting trip. Appellant was the only eyewitness, and the circumstances leading up to and surrounding Hankinson's death, according to appellant, were as follows: Appellant intended to sell Mead Merrill, a farmer, the idea of siding a chicken coop. Appellant had the privilege of hunting on Merrill's farm, and he and Hankinson decided to take guns. They were drinking whiskey from time to time—"that kind of goes with hunting"—but they were not intoxicated. They had an "over and under gun" (.22 rifle over a .410 shotgun) and a new .410 bolt action shotgun, both belonging to appellant. Merrill was not home when appellant and Hankinson arrived at his farm, but his farmhand permitted them to hunt. The hunting was not good, and they went to Pleasant Hill where they purchased more whiskey and visited a pool hall. They then resumed hunting around two or three o'clock in the afternoon near Kingsville at a place where they had hunted before. They went across some tracks and down in a "little gully affair" and "there wasn't any farm houses visible down in there where we were hunting." They had exchanged guns for luck, and appellant had the .410 shotgun and Hankinson had the "over and under gun." After they had hunted for an hour or so, Hankinson, who was walking behind appellant, "said something" and appellant turned around. They were then facing each other, about two to three feet apart, with Hankinson a little to appellant's right. Hankinson was carrying his gun with his right hand eight to twelve inches down from the muzzle, the barrel pointed forward and the butt down. Appellant testified that Hankinson said, "Hell, I can't hit anything with this either," and that he

"flipped it [the gun] up to me." Appellant, with the .410 shotgun in his right hand with his finger on the trigger and the barrel pointed down, grasped the "over and under gun" at the small of the stock when it was above his waist but below his shoulder. He stated his left index finger must have hit the trigger and that the gun discharged when the muzzle was eight to ten inches from Hankinson. The charge struck him in the chest. Appellant could get no response from Hankinson and he went for help. Bert Flora and George Good accompanied appellant to the scene. The three carried Hankinson a quarter of a mile to Flora's car and took him to Dr. Rawlins at Holden who pronounced him dead.

Dr. Joseph W. McMeans, an experienced pathologist, examined Hankinson's body and jacket on June 2, 1956. He found no evidence of burning or scorching. He testified that the shotgun charge entered the body in the third intercostal space approximately two and one-fourth inches to the left of the margin of the breast bone; that "the line of flight of the shotgun charge was from left to right slightly downward from horizontal and backward at an angle of about 45 degrees;" and that death was almost immediate. Although appellant testified that Hankinson had not had any other accident in which he had been injured, Dr. McMeans testified that the manubrium (top) bone of Hankinson's breast bone showed an unhealed transverse fracture and that there was a vertical fracture of the right second costal cartilage through its junction with the breast bone, and that these were above the shotgun wound and not caused by the shotgun charge. We also note that under appellant's account of the shooting, the course of travel of the shot would have been from right to left through Hankinson's body and on an upward or level course, but according to Dr. McMeans the course of the shot was from left to right and downward.

One of the pleaded and submitted defenses was that appellant had no insur-

able interest in the life of Hankinson. It has uniformly been held that "A person cannot take out a valid and enforceable policy of insurance for his own benefit on the life of a person in which he has no insurable interest; such a policy or contract of insurance is void and unenforceable on the grounds of public policy, it being merely a wagering contract; * *." 44 C.J.S. Insurance § 200; Butterworth v. Mississippi Valley Trust Co., 362 Mo. 133, 240 S.W.2d 676, 30 A.L.R.2d 1298; Woods v. Washington Fidelity Nat. Ins. Co., Mo. App., 113 S.W.2d 121; Williams v. People's Life & Accident Ins. Co., 224 Mo.App. 1229, 35 S.W.2d 922; American Central Insurance Co. v. Kirby, Mo.App., 294 S.W. 2d 556; Connecticut Mutual Life Insurance Co. v. Schaefer, 94 U.S. 457, 24 L.Ed. 251; 29 Am.Jur., Insurance, § 318; Vance on Insurance, 3rd ed., § 31; Richards on Insurance, 5th ed., § 89; Appleman, Insurance Law and Practice, § 761. It has repeatedly been stated that for one to have an insurable interest in the life of another, "there must be a reasonable ground founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit from or advantage from the continuance of the life of the insured." Connecticut Mutual Life Insurance Co., supra. See also Butterworth v. Mississippi Valley Trust Co., supra; Baker v. Keet-Roundtree Dry Goods Co., 318 Mo. 969, 2 S.W.2d 733; Alexander v. Griffith Brokerage Co., 228 Mo.App. 773, 73 S.W.2d 418; Indemnity Ins. Co. of North America v. Dow, 6 Cir., 174 F.2d 168; 44 C.J.S. Insurance § 203. It is readily apparent that if, as a matter of law, any interest of appellant in the insurance policy upon which this suit is brought was void and unenforceable, then the trial court could not have erred in refusing to direct a verdict for plaintiff and it would be immaterial whether there was error in any instruction.

For some unexplained and not readily apparent reason respondent did not move for a directed verdict at the close of all the evidence. On this appeal it has been content to devote its brief solely to answering the specific points raised in appellant's brief. In doing this it has made and briefed the contention that appellant had no insurable interest in the life of Hankinson. But, this contention is made in opposition to appellant's point that he was entitled to a directed verdict. This presents the somewhat unique question of whether on this appeal we should determine if appellant's asserted interest in the policy was void, or rule only on the specified issues raised by the points in appellant's brief.

◼ A respondent is not required to file a brief, although such a practice certainly is not to be encouraged, and he does not have the burden on appeal to establish the correctness of the judgment. Section 512.160 RSMo 1949, V.A.M.S., provides that "No appellate court shall reverse any judgment, unless it believes that error was committed by the trial court against the appellant, and materially affecting the merits of the action." It also provides that the appellate court shall examine the transcript on appeal, and subject to the above quoted provision and the provision that no allegations of error shall be considered other than those presented to or expressly decided by the trial court, (with two stated exceptions) shall "award a new trial or partial new trial, reverse or affirm the judgment or order of the trial court, or give such judgment as such court ought to have given * * *. Unless justice requires otherwise the court shall dispose finally of the case on appeal and no new trial shall be ordered as to issues in which no error appears." When the verdict and judgment in the trial court was for the respondent, and appellant's evidence affirmatively demonstrates that as a matter of law he is in no event entitled to any relief, it would then be most useless, and certainly not in the interest of justice for an appellate court to examine appellant's allegations of error for the ostensible purpose of determining if appellant is entitled to a

new trial. We shall, therefore, determine the validity of appellant's interest.

■ The burden of establishing the existence of an insurable interest in this case was on the appellant. Singleton v. St. Louis Mutual Ins. Co., 66 Mo. 63, 27 Am.Rep. 321; Ryan v. Metropolitan Life Ins. Co., 117 Mo.App. 688, 93 S.W. 347; Holabird v. Atlantic Mut. Life Ins. Co., Fed.Cas.No. 6,587; 46 C.J.S. Insurance § 1316b(1), p. 393; Appleman, Insurance Law and Practice, § 12223; Couch, Cyclopedia of Insurance Law, § 2216. Appellant had not only the burden to show the existence but the validity of the policy sued on. 46 C.J.S. Insurance § 1319b(1), p. 429. Although appellant contends otherwise, he has erroneously confused the difference between the burden of proof and the burden of going forward with the evidence.

Appellant contends that he had an insurable interest in the life of Hankinson on the basis that they were partners, and he also contends that because appellant's interest in the policy was obtained by the assignment and the change of beneficiary, it was not necessary that he have an insurable interest.

■ The evidence in this case justifies the comment that it taxes one's credulity to find the existence of a bona fide partnership. But assuming that there did exist an association which for some purposes could properly be designated as a legal partnership, that alone does not necessarily create an insurable interest. Sun Life Assur. Co. of Canada v. Allen, 270 Mich. 272, 259 N.W. 281; Powell v. Mutual Ben. Life Ins. Co., 123 N.C. 103, 31 S.E. 381, 68 Am.St. Rep. 818; Block v. Mylish, 351 Pa. 611, 41 A.2d 731. Admittedly, the abstract statement is not infrequently found that each member of a partnership has an insurable interest in the life of every other member, 44 C.J.S. Insurance § 210; 29 Am.Jur., Insurance, § 372; Appleman, Insurance Law and Practice, § 871, but an examination of the cases in which the question arose and was discussed discloses that these broad and

unqualified assertions of a general legal principle are misleading. While it is true that partners usually, and perhaps in most cases, have an insurable interest in the life of a copartner, it is the existence of circumstances which arise out of or by reason of the partnership, and not the mere existence of the partnership itself, that give rise to an insurable interest. The legal relationship of one partner to the other does not, and should not, necessarily create an insurable interest as does the relationship of husband and wife. In Connecticut Mut. Life Ins. Co. v. Luchs, 108 U.S. 498, 2 S.Ct. 949, 27 L.Ed. 800, one partner was held to have an insurable interest in the life of his copartner when he had advanced his copartner's share of capital for the business, and in Indemnity Ins. Co. of North America v. Dow, supra, a partner was held to have an insurable interest in the life of his partner when he furnished the capital and his partner furnished the technical "know-how" to operate the business. In each of these typical cases the circumstances gave rise to a reasonable ground founded upon the relations of the parties to expect pecuniary benefit or advantage from the continuance of the life of the insured. But, in Sun Life Assur. Co. of Canada v. Allen, 270 Mich. 272, 259 N.W. 281, 283, a case in which the facts reveal some striking similarities to the facts here, it was held that "The mere existence of a legal partnership does not establish an insurable interest," and in Powell v. Mutual Ben. Life Ins. Co., supra, it was held that if two partners have no capital invested in the partnership, and neither is indebted to the other, one partner has no insurable interest in the life of the other. For an interesting case, see Block v. Mylish, supra [351 Pa. 611, 41 A.2d 735], where a bona fide partnership existed, but the court commented that "The element of wager * * * could serve to deny the right of the partners to a reciprocal insurable interest" because under the peculiar facts of that case, and contentions of the surviving partners, "a partner's expectation of benefit or advantage could lie not in the continuance of the lives

of his partners but rather in the possibility of their deaths prior to his own."

The better rule, and the one based on sound reasoning, is that an insurable interest does not necessarily arise by virtue of the mere partner relationship alone. Therefore, the showing by appellant that he and Hankinson were partners did not of itself establish the existence in him of an insurable interest in the life of Hankinson. We must therefore look to the circumstances arising out of or by reason of the partnership to determine whether an insurable interest existed in this case.

■ Appellant's evidence conclusively establishes that Hankinson made absolutely no financial or capital contribution whatever to the alleged partnership, and that he did not in any way obligate himself to do so; that he had no technical knowledge, skill or ability as a worker or manager to add to the partnership; that he did not have any experience in the type of work he was to do or in the business of the alleged partnership; that appellant had no legal claim for his continued services; and that Hankinson did not purchase or acquire an interest in the business or the tools and equipment used in the business. Also there is nothing to indicate that Hankinson brought or could be expected to bring any business to the partnership, or that his presence as a partner increased or favorably affected the partnership good will. No circumstance is shown to exist which is of the usual type relied on to establish an insurable interest, and the evidence certainly does not show circumstances from which it could be inferred that the "business relationships of the two men were interlocked and intertwined and * * that for their mutual prosperity, they were mutually dependent upon each other." See Butterworth v. Mississippi Valley Trust Co., supra [362 Mo. 133, 240 S.W.2d 680].

■ Appellant does not contend that he had an insurable interest on the basis of a debtor-creditor relationship, but because appellant implied that he had made some "advances" to Hankinson in an undisclosed amount we shall consider this possibility. If these advances were made the amount necessarily had to be small because of the short period of time worked by Hankinson and the small volume of business. It is well settled that "to allow the creditor to procure insurance greatly exceeding the amount of the debt might be to tempt him to bring the debtor's life to an unnatural end, and thus contravene the principle of public policy which has been seen to lie at the very basis of the doctrine of insurable interest," and "The only practical working rule would seem to be that when the disproportion between the insurance and the debt is so great, taken with the other circumstances of the case, as to show a want of good faith in the creditor, the policy will be deemed a wager contract, and void." See Vance, on Insurance, 3rd ed., § 32. The facts here unquestionably bring this case within this sound rule.

The evidence of appellant affirmatively establishes that at most he and Hankinson had a bare legal partnership with none of the usual incidents thereof which have resulted in one partner having an insurable interest in his copartner, and the evidence presents no circumstance from which it could be inferred that the loss of the services of Hankinson or the dissolution of the partnership by reason of his death could possibly have resulted in any pecuniary loss to appellant in the sense in which that term is used in determining the existence of an insurable interest. There was no insurable interest based on "blood or affinity," and the evidence reveals no reasonable ground founded upon the alleged partnership for appellant to have expected any pecuniary benefit or advantage from the continuance of the life of Hankinson. Therefore, we are constrained to and do conclude that appellant's evidence affirmatively establishes that as a matter of law he had no insurable interest in the life of Hankinson.

■ Appellant contends that it was not necessary that he have an insurable in-

terest because the policy was originally issued to Hankinson with his wife named as beneficiary, and that the beneficiary was changed to appellant and the policy assigned to him. There is no question but that it is the general rule in this state that a person has an insurable interest in his own life and may take out a policy of insurance thereon and name as beneficiary a person who has no insurable interest in his life, except when prohibited to do so by statute as is true in insurance policies issued by assessment companies. Walker v. General American Life Insurance Co., Mo.Sup., 141 S.W.2d 785; Mutual Bank & Trust Co. v. Shaffner, Mo. Sup., 248 S.W.2d 585; Runnion v. Paquet, Mo.App., 233 S.W.2d 803. Also, it was settled by Butterworth v. Mississippi Valley Trust Co., supra, that one may procure an insurance policy on his own life and assign it to another who has no insurable interest, provided it not be done by way of cover for a wagering policy. See also annotation 30 A.L.R.2d 1310. However, the undisputed facts in this case conclusively establish that if Hankinson did take out the insurance on his own life, there was not a bona fide assignment of the policy and change of beneficiary as in the Butterworth case. There the insured took out a term policy of insurance on his life for his own benefit and maintained the policy for five years. He then converted it to ordinary life and assigned it to one who then had an insurable interest who subsequently assigned it pursuant to a bona fide business transaction to a trust which had no insurable interest. In this case, the evidence establishes that although Hankinson made application to respondent for $25,000 insurance on his life with his wife being named as beneficiary, he refused to accept the insurance policy which was submitted to him by respondent, and that it was appellant who "took it [the policy] as business insurance." Appellant personally paid the premium thereon, and he simultaneously made arrangements to be designated as beneficiary and to have the policy assigned to him. This unquestionably constituted one transaction whereby appellant caused to be issued for his own benefit a policy of insurance, for which he paid the premium, on the life of Hankinson in which he had no insurable interest. "The wager life insurance contract rule, * * * applies where a policy has been taken out by, and the premiums paid by, a person who has no insurable interest in the life of the insured, or when it has been assigned for speculative purposes, * * *." Butterworth v. Mississippi Valley Trust Co., supra [362 Mo. 133, 240 S.W.2d 682].

We cannot escape the conclusion that any interest of appellant in the policy of insurance upon which this suit is brought was void and unenforceable by appellant as against public policy, and on a new trial, assuming appellant was otherwise entitled thereto, he could not in any event recover. Therefore, it is immaterial on this appeal whether the trial court erred in any of the respects contended by appellant.

The judgment for respondent is affirmed.

BOHLING and BARRETT, CC., concur in result.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All concur.