NEW ENGLAND MUTUAL LIFE INSURANCE COMPANY, a corporation, Appellee,

v.

Shirley Ann NULL, Individually and as Administratrix of the Estate of Victor G. Null, Deceased, Appellant.

No. 76–1426.

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1977.

Decided May 11, 1977.

Joseph W. Toeniskoetter, St. Louis, Mo., for appellant; Andrew P. Deschu, St. Louis, Mo., on brief.

P. Terence Crebs, St. Louis, Mo., on brief for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, and BRIGHT and ROSS, Circuit Judges.

BRIGHT, Circuit Judge.

Shirley Ann Null, widow of murder victim Victor G. Null, brings this appeal from a summary judgment declaring a personal life insurance policy issued on the life of Victor G. Null by appellee New England Mutual Life Insurance Company (New England) to be void from the beginning because Ronald Calvert, a person then intending to cause the death of the insured, Victor Null, participated in arrangements to purchase the policy and contemporaneously secured from Victor Null an assignment thereof under which Ronald Calvert became an indirect beneficiary of this policy. We reverse the judgment and remand for further proceedings.

The district court's opinion awarding summary judgment is reported as *New England Mut. Life Ins. Co. v. Calvert*, 410

F.Supp. 937 (E.D.Mo.1976). This litigation is the aftermath of the successful federal prosecution of Ronald Calvert on charges of mail fraud, wire fraud, and conspiracy. We affirmed that conviction in *United States v. Calvert*, 523 F.2d 895 (8th Cir. 1975), *cert, denied*, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976). The district court based its summary judgment on the evidence and the implicit factual conclusions underlying the jury's guilty verdict in *United States v. Calvert, supra. New England Mut. Life Ins. Co. v. Calvert, supra*, 410 F.Supp. at 939–41.

Our opinion in the criminal case outlined Ronald Calvert's scheme to defraud insurance companies by obtaining several insurance policies on the life of Victor Null, an inventor and business associate of Calvert's, and then attempting to "contract" for Null's murder as a means of collecting the multimillion dollar proceeds of the policies through his father, James Calvert, who was named as beneficiary or assignee on all the life insurance policies. The Government's prosecution of Ronald Calvert rested on mail and wire transmissions made in fraudulently obtaining the insurance policies.[1] This court's opinion recited the circumstances surrounding the issuance of two insurance policies by appellee New England, as well as those concerning a number of policies issued by other insurers. For factual background, we repeat the portion of the opinion discussing the issuance of the New England policies, including the $100,000 "personal" policy on the life of Null following Ronald Calvert's unsuccessful attempt to obtain a $500,000 policy from Prudential Insurance Company:

> In May 1972, the defendant [Ronald Calvert] contacted a local agent for Prudential Insurance Company and filled out an insurance application seeking $500,000 coverage on Null's life with James Calvert [father of Ronald Calvert] as the beneficiary. The defendant delivered a check for more than $10,000, signed by his father. The Prudential office in St. Louis mailed the application and medical examination forms to the home office in Houston * * *. Before the check was deposited, the defendant contacted the local agent and declared that he wanted to add accidental death benefits. The agent informed the defendant that this was more than Prudential normally writes in accidental death, and that he would have to check with the home office in Houston. A new check was delivered to replace the prior one. The local office then mailed a letter to Houston advising the home office of the change in the application * * *. The local agent learned that Prudential would not authorize such a large policy, and informed the defendant of this fact. The defendant then asked the agent to withdraw the application, because he did not want the application to be rejected. This was done.

> The defendant thereafter met with a local agent for New England Mutual. The agent informed the defendant that the application would have to be accompanied by a letter containing information on the partnership, that both would have to be sent to underwriters, and that there were no underwriters in St. Louis. Such a letter was mailed to the home office in Massachusetts on July 10, 1972 * * *. In analyzing the application, New England relied on the financial stability of the defendant's father; the defendant had deposited money into one of his father's bank accounts to bolster the appearance of stability. On July 19, 1972, the local agent received a mailgram from the New England home office approving $150,000 business and $100,000 *personal* insurance on the life of Null * * *. The local agent informed the defendant that New England had approved these lesser amounts, rather than the $500,000 requested and that an application from Null himself would be needed for the personal insurance. The defendant sub-

---

1. Null was found dead on November 9, 1972, having been shot four times. The murderer, however, was never found.

sequently accompanied Null to the local office, where the latter submitted an application for personal insurance in the amount of $100,000, with an accidental death benefit of $100,000. At the same time, Null assigned the personal policy to James Calvert.[2] This assignment was apparently not known to the home office until September. The premium check was signed by James Calvert. On July 24, 1972, the local agent mailed a letter to the home office in Massachusetts, advising them that the premium had been collected, and forwarding the application for personal insurance signed by Null * * *. On September 1, 1972, the assignment and change of beneficiary form which Null had signed in the defendant's presence was mailed to the home office * * *.

On July 24, 1972, a new partnership agreement was reached, bringing in several new partners, including an attorney and a C.P.A. In early September, a separate agreement was signed by all the partners stating that the New England insurance belonged exclusively to James Calvert. [*United States v. Calvert*, 523 F.2d 895, 900–01 (8th Cir. 1975) (note 2), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976) (emphasis added).]

Appellee recites several additional facts[3] relating to the issuance of the $100,000 policy in the name of Victor G. Null:

* * * Mr. Null * * * was to be the owner subject to receipt of a new application and additional information. * * * Under date of July 21, 1972, a new application was secured for the said $100,000 policy * * *. Although that application indicates that premium was received at the time of the making of the application, such premium was in fact not received until July 24, 1972.

On that date Mr. Null and defendant Ronald F. Calvert presented themselves at the Whitney St. Louis Agency of appellee. Defendant Ronald F. Calvert delivered a check of his father to Mr. Whitney. * * * The amount of that check, namely $5,616.00, * * * included advance payment of premium for both policies appellee had agreed to issue. Also on July 24, 1972 at the same time the check for the payment of the premium was delivered, Victor G. Null executed an Absolute Assignment and Change of Beneficiary form to James Henry Calvert of the $100,000 policy appellee had agreed to issue. * * * The Absolute Assignment and Change of Beneficiary form was not received in appellee's home office in Boston, Massachusetts, until September 5, 1972. * * *

In August, 1972, both policies were delivered to defendant, Ronald F. Calvert. [Appellee Br. at 11–12 (references to record and footnotes omitted).]

In this action to void the two life insurance policies referred to above, New England named as parties Ronald Calvert, the criminal defendant, and James Calvert, his father, who was the named owner-beneficiary in the $150,000 policy and assignee of the $100,000 policy, and the appellant Shirley Ann Null, individually and as administratrix of the estate of Victor G. Null. Appellee sought a declaratory judgment that none of the defendants were entitled to any benefits under these two insurance policies. Mrs. Null filed a counterclaim seeking a determination that she, as personal representative of the Null estate, should recover the proceeds of the $100,000 policy on the life of Victor G. Null. Jurisdiction rests on diversity of citizenship and the requisite amount in controversy. Missouri law controls this litigation.

---

2. In fact, it appears that the assignment was not made until three days later, July 24, 1972.

3. Appellee, in moving for summary judgment, noted that proceedings in the criminal case had been stipulated as part of the record in this civil case. The district court in its opinion, however, made no reference to factual matters other than those discussed by this court in the criminal case. We have, however, considered the record as establishing those additional facts quoted from appellee's brief. Appellant has not taken issue with the recitation of those facts.

The district court decided that the jury's guilty verdict in the criminal case necessarily determined that Ronald Calvert, acting through Victor Null, procured from New England the disputed policies of insurance on the life of Mr. Null, with the "then-existing intent to cause Null's murder," 410 F.Supp. at 940, "as part of the scheme by Calvert to defraud" insurance companies, *id.*, and that such finding served to void the policies as to Ronald Calvert and James Calvert, because an insurer is relieved of all liability on a policy procured by a beneficiary intending at the time of the procurement to murder the insured. *Id.*

The district court judgment declaring the policies void *ab initio* has become final and conclusively binding as against Ronald Calvert and James Calvert because neither has processed an appeal to this court.

■ The district court employed a similar analysis in rejecting the Null estate's claim to the $100,000 policy issued on Victor Null's personal application, stating:

> In the present context, the jury conviction in *United States v. Calvert, supra,* is conclusive of the fact that the mailing of the application for personal insurance was part of Calvert's scheme to defraud and that it was Calvert who caused the mailing. Accordingly, defendant Null's contentions are without merit. [*New England Mut. Life Ins. Co. v. Calvert,* 410 F.Supp. 937, 941 (E.D.Mo.1976).]

Usually, when a beneficiary murders an insured, the insurer is not relieved of all liability, but must pay the proceeds of the policy to contingent beneficiaries or the estate of the insured. However, the district court relied upon the accepted principle that holds a life insurance policy void from the beginning and relieves the insurer of all liability upon the subsequent homicide of the insured where it is shown that a beneficiary procured the policy possessing a present intention to murder the insured. *See* cases cited *id.* at 940, and particularly *Aetna Life Ins. Co. v. Strauch,* 179 Okl. 617, 67 P.2d 452 (1937), *overruled on other grounds, Howard v. Jessup,* 519 P.2d 913, 917 (Okl.1973).

The district court reasoned that Victor Null served as an innocent instrumentality of Ronald Calvert in obtaining the $100,000 policy from New England, relying upon *Lakin v. Postal Life & Cas. Ins. Co.,* 316 S.W.2d 542 (Mo.1958). In *Lakin,* the Missouri court considered a relationship among insured, insurer, and assignee similar to that presented in the present appeal. The insured applied for a policy naming his wife as a beneficiary and himself as owner, and later assigned the policy to a "business partner" of the insured named Lakin. Lakin later killed the insured, allegedly by accident. The court held that Lakin had no insurable interest in the life of the deceased, who was at best a "bare" legal partner who had contributed nothing to the "partnership." The court rejected Lakin's claim that he did not need an insurable interest to recover on a policy which initially had been issued to the insured as owner, noting that Lakin

> personally paid the premium thereon, and he simultaneously made arrangements to be designated as beneficiary and to have the policy assigned to him. This unquestionably constituted one transaction whereby appellant caused to be issued for his own benefit a policy of insurance, for which he paid the premium, on the life of Hankinson [the insured] in which he had no insurable interest. [*Lakin v. Postal Life and Casualty Insurance Co.,* 316 S.W.2d 542, 552 (Mo.1958).]

Language contained in *Strauch* and *Lakin* support appellee's contention that Ronald Calvert, acting through James Calvert and Victor Null, actually obtained the insurance policy from New England and became an indirect beneficiary thereof and, therefore, that policy must be deemed void *ab initio.*

Appellant does not dispute the application of this rule of law derived from *Strauch* and *Lakin,* but makes the contention that if Victor Null applied for the disputed policy with a bona fide intent to insure his life for the benefit of his own estate, as indicated on the application, Calvert's unlawful intent at the inception of the policy to murder Mr. Null and the relat-

ed fraud practiced by Calvert to attempt to obtain the benefits of the policy through an assignment do not alter the contractual relationship between Null and the insurer or void the policy as to the Null estate.

This contention, based upon appellant's drawing of certain inferences from undisputed facts, carries some merit. In the *Strauch* case, the Oklahoma court cautioned:

> The mere fact that the beneficiary or some other party entertains a secret intent to murder one who is procuring insurance does not relieve the company from liability upon the subsequent commission of the unlawful homicide if the expected murderer does not participate in procuring the insurance in such a manner as to become, in effect, the party who contracts with the Insurance Company. [*Aetna Life Ins. Co. v. Strauch*, 179 Okl. 617, 67 P.2d 452, 453 (1937).]

■ The district court in rejecting Mrs. Null's claim focused solely upon the conviction of Ronald Calvert, concluding that the jury verdict in the criminal case conclusively established that Calvert was the one who procured the policy in question, and that Null had no bona fide intent to insure his life for the benefit of his estate. But that reasoning is not consistent with Missouri and federal case law, which holds that a judgment in a criminal case cannot be used to establish the truth of the facts upon which the conviction is based in a civil action brought by one not a party to the criminal action. *See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *State Farm Mutual Automobile Insurance Co. v. Worthington*, 405 F.2d 683, 686–87 (8th Cir. 1968); *Osborn v. Gibson*, 309 S.W.2d 15, 18 (Mo.App.1958); *Bibbs v. Fidelity Health & Accident Co.*, 71 S.W.2d 764 (Mo.App.1934).

The district court cited *Connecticut Fire Insurance Co. v. Ferrara*, 277 F.2d 388 (8th Cir.), *cert. denied*, 364 U.S. 903, 81 S.Ct. 231, 5 L.Ed.2d 195 (1960), and *In re Estate of Laspy*, 409 S.W.2d 725 (Mo.App.1966), in support of its view that the jury verdict

conclusively established as to all the parties in this case that Ronald Calvert was the one who had, as part of his fraudulent scheme, procured the $100,000 policy from New England. In those cases, persons convicted of crimes attempted to profit from their own criminal acts through subsequent civil litigation. They do not support the proposition that Mrs. Null is bound by the result in a criminal prosecution to which she was not a party.

New England contends that even if the jury verdict in *United States v. Calvert* does not bind appellant Mrs. Null as to the intention of Victor Null, the record demonstrates that New England is, nevertheless, entitled to judgment as a matter of law.

■ Summary judgment is an extreme remedy which is not to be granted unless the movant has established his right to judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any possible circumstances. The court must view the facts most favorably to the party opposing the motion and give that party the benefit of any reasonable inferences to be drawn from the facts. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 153–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207 (8th Cir. 1976); *Ozark Milling Co. v. Allied Mills, Inc.*, 480 F.2d 1014, 1015 (8th Cir. 1973). With this standard in mind, we examine New England's contention.

■ New England points to evidence produced at the criminal trial (*see* 523 F.2d 900–01 n.2, quoted *supra*) that Null apparently never contemplated obtaining life insurance before New England refused Ronald Calvert's application for $500,000 of business life insurance on Null's life; that Null never paid any premium on the policy; that Null executed the assignment to James Calvert at the same time that Ronald Calvert delivered James Calvert's check for the premium on the policy to an insurance agent; and that shortly before his death,

Null told his wife that he intended to speak to Ronald Calvert about cancelling the insurance and quitting the partnership. Appellee asserts that such evidence establishes conclusively that Null never intended that he or his estate should possess any interest in the disputed policy. Thus, appellant argues that Ronald Calvert used Null as an innocent instrumentality to obtain the additional insurance for Calvert's benefit, circumventing New England's refusal to issue more than $150,000 of business life insurance on Null's life.

Mrs. Null, on the other hand, contends that Victor Null intended to provide his family with insurance protection and that he must have been fraudulently induced or tricked by Ronald Calvert into assigning the policy to James Calvert. She asserts that Null's responsibility to his wife and two young children provided him with a good reason to obtain life insurance protection and that it is not likely that Null would have participated in a scheme to deceive the insurance company solely for the Calverts' benefit. She notes that New England first broached the idea of personal insurance for Null, which explains why Null applied for the personal insurance on July 21, 1972 and not earlier. According to Mrs. Null, the fact that the Calverts were to pay for the policy does not create an inconsistency with Null's intention to benefit his estate, given the widespread use of so-called "split dollar" insurance plans. Finally, Mrs. Null argues that if allowed to go to trial, she will offer testimony that Null told his wife he had obtained a large insurance policy on his life for the benefit of his family.

The ultimate fact question regarding the Null estate's claim to the $100,000 personal policy is whether Null executed the application and procured the insurance for his own purposes and thus became the contracting party with the insurer, or instead merely served as an innocent instrumentality in the evil scheming of Ronald Calvert, the person actually procuring the policy from New England. Even though many of the facts bearing on Null's intent are undisputed, the parties draw from those facts conflicting inferences which are not patently incredible or untenable. In these circumstances, summary judgment is inappropriate, see *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Chenette v. Trustees of Iowa College, Grinnell, Iowa*, 431 F.2d 49, 53 (8th Cir. 1970), especially when the disputed issue is one concerning a person's motivation or intent, see *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 184–85 (8th Cir. 1976), cert. denied, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977); 6 *Moore's Federal Practice* ¶ 56.17 [41.–1] (2d ed. 1976).

New England makes an additional argument requiring discussion. New England asserts that even if Null intended to benefit his estate when he executed the application on July 21, 1972, no "meeting of the minds" occurred and thus no contract of insurance with Null could exist, because Null had assigned his interest in the application to James Calvert before July 26, when New England received the application at its home office and was first able to accept it. This argument ignores Mrs. Null's contention that the assignment was obtained by fraud and can therefore be voided by Null or his estate, thus making Null and New England the actual contracting parties at the time of New England's acceptance of the application on July 26, 1972, forty days before New England received the assignment to James Calvert on September 5, 1972.

■ Accordingly, it cannot be said on this record that appellee is entitled to a judgment as a matter of law against Mrs. Null. The district court did not make findings of fact, but determined from findings implicit in the guilty verdict of the jury in the criminal trial that Ronald Calvert was the real contracting party with the insurer and that his then-existing criminal intent served to void the policy. Because the criminal case cannot operate to establish the crucial facts in the present civil lawsuit, we must remand this case to the district court for further proceedings not inconsist-

ent with this opinion. We express no opinion on the merits of the case otherwise. Whether Victor Null was a real party to the disputed insurance contract is a matter which the trial court must resolve in a plenary trial.[4]

4. Appellee New England argues that the notice of appeal is not sufficient to present to us the validity of the $100,000 policy because the notice refers only to the judgment on Mrs. Null's counterclaim and not the judgment entered on the complaint declaring the policy void *ab initio*. Because no appeal was taken from the judgment on the complaint, New England argues, Mrs. Null is now bound by that judgment on her counterclaim on the only issue raised in this appeal, the validity of the policy, and the appeal therefore must be dismissed.

We disagree. The district court's decision resolved only one issue which necessarily disposed of both New England's complaint and Mrs. Null's counterclaim—the validity *ab initio* of the $100,000 policy. Thus, the notice of appeal is sufficient to present all the issues presented on this appeal, even though the notice may have been better phrased had it referred to all aspects of the judgment which could be considered adverse to appellant. Accordingly, we deny New England's motion to dismiss the appeal.