**Alan M. RUBENSTEIN**

v.

**The MUTUAL LIFE INSURANCE CO. OF NEW YORK.**

**Civ. A. No. 82–4884.**

United States District Court, E.D. Louisiana.

April 9, 1984.

E. Gordon Schaefer, Jr., New Orleans, La., for plaintiff.

Raymond J. Salassi, Jr., New Orleans, La., for defendant.

CHARLES SCHWARTZ, Jr., District Judge.

This matter was tried before the Court, sitting without a jury, on a former day, at which time it was taken under submission. After considering the record herein, the evidence adduced at trial, the memoranda of counsel, and the law, the Court finds as follows.

To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

Plaintiff, Alan M. ("Mike") Rubenstein, instituted this action to recover the proceeds of a $240,000 credit life insurance policy issued by defendant, The Mutual Life Insurance Company of New York (MONY), insuring the life of Harold J. Connor, Jr. Connor died on November 6, 1979. Plaintiff is the beneficiary and owner of said policy; MONY claims that plaintiff is not entitled to recovery under the policy for reasons that are the subject of this suit,

and refunded to plaintiff the premiums paid by plaintiff.

Plaintiff is a resident of Louisiana; defendant is a corporation incorporated and domiciled in New York, authorized to do and doing business in Louisiana. Prior to, during, and after July, 1979, plaintiff was employed as a fulltime owner and operator of a taxi cab associated with the United Cab Company of New Orleans. After attending a local seminar, he purportedly became interested in starting and developing "TV Journal," a publication similar in concept to "TV Facts," to be circulated free of charge in St. Tammany Parish. Revenues were to be derived solely from paid advertisements contained in the publication. In late July, 1979, Connor contacted plaintiff through the Louisiana Unemployment Commission in Slidell, where plaintiff had placed a notice requesting assistance in developing and operating the "TV Journal." On August 7, 1979, shortly after their initial meeting, plaintiff and Connor entered into a partnership agreement making Connor a 25% partner in the "TV Journal" business until January 1, 1980; thereafter, plaintiff would "grant" Connor a franchise for the publication of a tabloid in the St. Tammany Parish area to be entitled "TV Journal." Under the franchise aspect of the agreement, Connor was required to pay plaintiff $1000 per month for 20 years beginning on February 1, 1980, but could terminate the agreement at any time upon 60 days notice without penalty.

Also on August 7, 1979, plaintiff and Connor met with Earl Moreau, a MONY agent, regarding life insurance on Connor. Based on discussions between plaintiff, Connor and Moreau concerning plaintiff's newly established business relationship with Connor, Moreau recommended and plaintiff applied for, a $240,000 credit life insurance policy on Connor's life, who was then 23 years old.[1] As of the date of

---

1. Credit life insurance is to be distinguished from a "key man" business insurance policy. With the former, the insurer risks that the debtor-insured will die before he can repay the creditor-beneficiary an existing debt. Under the lat-

ter, the insurer risks the death of someone whose loss would be highly detrimental to the business. From his discussions with plaintiff and Connor, Moreau correctly concluded that

application, Connor had done little if any work for the "TV Journal" business; and no edition of it had been published, and no advertisements sold. No evidence was introduced to demonstrate the need for this fledgling and undercapitalized business to expend its limited resources for insurance on the life of an apparently healthy 23 year old man.

In providing information for the insurance application, plaintiff and Connor represented that Connor's annual income at the time of the application was $26,000 when in fact Connor's sole source of income was the "TV Journal" business, from which he received approximately $100 to $150 a week. Had MONY known Connor's actual income, it would not have issued the policy herein since an insured earning such limited income has no reasonable prospect of repaying a debt of $1000 per month for twenty years without the life insurance. Testimony of William J. Daly of MONY. Since plaintiff and Connor knew Connor's actual income, and knew that he never had an income of that amount and was unemployed just prior to their association, and since there is such a large discrepancy between Connor's stated and actual income, we find that they had knowledge of the falsity of the representations regarding Connor's income. We further find from the circumstances that plaintiff and Connor believed said misstatement to be material because in their discussions with Moreau, they collectively sought to find the "most viable" insurable interest; since individuals of even limited experience with insurance realize that an insurance company would not accept the risk of a $240,000 debt when the debtor earns only $7800 annually; and because plaintiff on being questioned failed to provide any other explanation for the misstatement in the application he signed except to deny any awareness of it having been made.

Plaintiff and Connor also failed to disclose to Moreau that Connor could termi-

nate the partnership-franchise agreement at his whim with 60 days notice. The effect of the termination provision is to limit the maximum debt that Connor could have incurred to $2000 (for two months). Had MONY known of the provision, it would not have issued a credit insurance policy for $240,000. Testimony of Daly. We find that plaintiff and Connor knew that their failure to disclose the termination provision resulted in a false statement as to the amount Connor could be indebted to plaintiff. We further find from the circumstances that plaintiff in particular knew of the materiality of said nondisclosure since had he disclosed it he could not have claimed a debt for an amount over $2000, and because there was no evidence to suggest any other reason why the provision was not disclosed when plaintiff had disclosed other particulars of the partnership agreement during his discussions with Moreau.[2]

The evidence further establishes that when plaintiff applied for the insurance policy, and when Connor died on November 6, 1979, Connor was not at all indebted to plaintiff because Connor was not obligated to begin making payments to plaintiff until February 1, 1980.

Based on the information before it, MONY agreed to issue the policy on September 28, 1979; it was thereafter delivered to plaintiff on October 6, 1979.

According to plaintiff's testimony, Connor was to do all the work in preparing the "TV Journal" for publication, while plaintiff was to provide the capital. However, Connor's education was limited to high school, and prior to August 7, 1979, he had no experience in publishing and only limited experience in sales, having worked for approximately two months without success as a furniture salesman, according to Paula Andrus, Connor's girlfriend at the time. Ms. Andrus also attested to Connor's inability to balance his own checking account,

---

plaintiff was ineligible for "key man" insurance on Connor's life.

2. During the testimony, plaintiff explained that he did not remember whether he had informed Moreau of the termination provision.

further evidence of his lack of business skill.

Plaintiff, too, had no prior experience in publishing or in selling advertisements, his only sales experience of any nature having occurred "years" ago, by his own admission. Plaintiff did observe the operations of "TV Tempo" for the purpose of learning the operations of such a weekly, and prior to August 7, 1979 had taken some preliminary steps in furtherance of the "TV Journal" (e.g. contacting printers, obtaining proofs and TV listings, and figuring possible advertising rates). But, after that date, plaintiff's involvement in the operations of the "TV Journal" was nominal at best; he testified that he did not even know whether Connor had sold a single advertisement, and plaintiff himself had made only a few calls for that purpose. Plaintiff also stated that he was not aware of what bills Connor was paying, or how much he was paying Connor in salary. As further evidence of his own lack of business acumen, plaintiff explained the origin of the provision requiring Connor to pay him $1000 per month beginning February 1, 1980 by saying that they "both came up with the idea of $1000," with no further justification for the projection.

Regarding the financing of "TV Journal," plaintiff explained that he bought some furniture for the office, which was located in Connor's apartment, and that he paid Connor's salary and "whatever" else Connor needed. The evidence indicates, however, that *at most* $5000 was available as of late August, 1979 to develop the "TV Journal" until it became profitable or generated significant advertising revenues. Most of the $5000 apparently originated from a $5433 loan issued by the Bunkie Bank & Trust Company on August 22, 1979, for which *Connor* signed the note and plaintiff provided the collateral. Of the $5433, however, $1400 was used by plaintiff to pay off a previous personal loan from Bunkie Bank & Trust, and $1000 was given to Connor for his personal use. Disposition of the remaining $3000 is unclear, although it appears that the money was deposited in plaintiff's personal account with the Hibernia National Bank, which account he used to pay Connor's salary. This account showed a balance of $1246 on November 7, 1979, which was immediately before Connor had planned to print the first issue. Plaintiff's only other account was one he maintained with Bunkie Bank & Trust from November, 1976 to November, 1979. It had an average balance of $1500 to $1800 before it was closed. The "TV Journal" account at the Fidelity Bank & Trust Company shows a balance that was overdrawn twice in a two month period. Defendant's Exhibit No. 16.

The limited capital available to the "TV Journal" immediately prior to when Connor intended to print the first issue, and the inexperience of plaintiff and Connor lead to the inescapable conclusion that there was no reasonable chance that "TV Journal" could become a profitable publication, much less a publication capable of supporting $1000 monthly payments from Connor to plaintiff. According to the testimony of Brian Saucier, a tabloid of this type whose advertising is not sold in advance of its first publication requires substantially longer than six months before it reaches the breakeven point, and a minimum of $10,000 to $15,000 in start-up capital, based on an estimated printing and distribution costs of $1132 for each issue and *maximum potential* weekly advertising revenues of $1100 to $1200. Considering plaintiff's annual net income of $10,000 to $14,000, and the approximately $1300 available to the "TV Journal" immediately prior to its first scheduled printing, we conclude that "TV Journal" was grossly undercapitalized.

In addition, the failure of "TV Journal" to presell any advertisements or to obtain any advertising contracts further impaired any likelihood of success; without presold advertisements, the business would have incurred substantial losses during its first six months, from which it would have had little chance of recovering. Given this slim chance of reaching the breakeven point, Connor would have had no realistic possibil-

ity of being able to cover the $1000 monthly payment to plaintiff.

Moreover, the failure of Connor to presell any advertisements shows a lack of understanding of the fundamental principles of publishing a tabloid of this nature, indicative of the inexperience and lack of business acumen of both Connor and plaintiff, which we also find severely undermined the possibility of the "TV Journal" being successful. Considering their inexperience, it is not surprising that Connor had not sold any advertisements and had been able to find only a handful of advertisers willing to place advertisements for no cost and strictly on a trial basis.

The bizarre circumstances surrounding the tragic death of Harold J. Connor, Jr., even after lengthy testimony from five witnesses who were present when Connor was shot, are still largely in dispute and somewhat irreconcilable. What was established conclusively at the trial was as follows: Connor was part of a deer hunting party that included plaintiff, plaintiff's step children, David and Darryl Perry, and the Perrys' first cousin, David Kenney. They left the New Orleans area on November 5, 1979, and arrived at plaintiff's parents' home in Bunkie later that day. Thereafter, plaintiff's brother, Larry Rubenstein, and a friend of his, Michael Fournier, also arrived at the home of plaintiff's parents. Plaintiff claims that he had no prior notice of his brother's and Fournier's visit. The latter joined the hunting party early the following morning. The group traveled in plaintiff's car on a dirt road surrounded by woods to a location selected the previous evening when plaintiff visited his uncle and cousin.

When the party arrived at the location, plaintiff distributed the firearms, ammunition, and orange hunting vests to each member of the group. Thereafter, Kenney locked the car keys inside the car, and the group searched for wire with which to open the door lock. Soon after Connor was able to open the front door on the passenger side, Fournier, who was standing less than 10 feet behind Connor, discharged his gun, a single shot, 12-gauge shotgun. The pellets struck Connor in the back, slightly above the waist, and traveled generally in a lateral path through his body.

Fournier claims that the gun discharged when he tripped, and Darryl Perry, in corroborating his testimony, claims that the gun discharged about when the butt was close to the ground and while the barrel was pointed diagonally upward in the direction of Connor. This testimony, however, was flatly contradicted by the forensic scientist and pathologist, who concluded that in view of the lateral path of the pellets through Connor's body above his waist, the barrel of the gun must have been parallel (horizontal) to the ground and at waist level at the time of discharge. Further, because of its safety device, in order for the gun to have been discharged, it must have been loaded, cocked, and the trigger pulled. The firing pin could not have been activated just by the gun striking the ground. (Testimony of forensic scientist Ronald Singer and pathologist Dr. Tom D. Norman.)

The testimony of the witnesses raises more questions than it answered, in particular: why did Connor go deer hunting when according to his mother, girlfriend and cousin, he had never been hunting before and was disgusted by the idea of killing animals, and did not pack the proper clothing? And why did Fournier load his gun, cock it, have his finger on the trigger, and have it pointed at Connor? We conclude that examined in *the light most favorable* to the plaintiff, his handing a shotgun and ammunition to an individual who was, according to plaintiff, previously unknown to him, and who was, it was later learned, a convicted felon then on probation[3] and prohibited from carrying firearms, constitutes conduct falling well below the standard of care required of a

---

**3.** After the shooting Fournier's probation was revoked and he was incarcerated, since as a convicted felon he was not allowed to possess a firearm; he is presently incarcerated as a result of his conviction for burglary.

reasonable person in possession of firearms. Examining the evidence not in the light most favorable to plaintiff but instead with the slightest circumspection leads to the distasteful conclusion that Harold J. Connor, Jr. was killed under highly suspicious circumstances, circumstances that suggest something far more sinister than a mere "accident."

## CONCLUSIONS OF LAW

This Court has jurisdiction under 28 U.S.C. § 1332.

Defendant interposes three separate and independent defenses to plaintiff's claim that he is entitled to recover under the $240,000 credit insurance policy insuring the life of Harold J. Connor, Jr.: (1) that defendant was induced to execute the policy by material misrepresentations made with the intent to deceive the insurer; (2) that plaintiff as the beneficiary lacks an insurable interest in the life of the insured; and (3) that plaintiff was culpably negligent in contributing to the death of the insured, and that such negligence bars his recovery under the policy. For the purposes of this decision, we need only consider defendant's first two defenses, and make no ruling on the third.

■ Under Louisiana law, a life or health insurance policy is null and void if the insurer is induced to execute the policy by misrepresentations in the application that were made with the intent to deceive and if the misrepresentations materially affected the insurer's decision to accept the risk or increased the hazard assumed by the insurer. La.R.S. 22:619(B); *Coleman v. Occidental Life Insurance Co. of North Carolina,* 418 So.2d 645, 646 (La.1982); *Lentz v. Metropolitan Life Insurance Co.,* 428 F.2d 36, 39 (5th Cir.1970). The insurer has the burden of proving the elements of La.R.S. 22:619(B).

■ Consistent with the foregoing findings, wherein we found that plaintiff and Connor misrepresented Connor's salary and failed to disclose the termination provision; that they knew of the falsity and the materiality of their misrepresentations; and that each of said misrepresentations materially affected the insurer's decision to accept the risk; we find that the insurance policy in question is null and void under La.R.S. 22:619(B). We further conclude that each of the misrepresentations constitutes a separate and independent ground for invalidating the insurance policy under said statutory provision.

■ Louisiana law also requires that a beneficiary who procures an insurance policy upon the life of another have an insurable interest in the life of the insured. La.R.S. 22:613(A). The absence of any insurable interest on the part of the beneficiary who procures the policy invalidates the policy, and the insurer's only liability is to return the premiums paid. *Id.; Goodwin v. Federal Mutual Insurance Co.,* 180 So. 662 (La.App.1938). The beneficiary has the burden of proving the existence of the insurable interest.

■ A beneficiary who is not related by blood or marriage to the insured does not have an insurable interest unless he has a reasonable expectation of pecuniary gain from the continued life of the insured, or reasonable expectation of sustaining loss from his death. *Goodwin, supra,* at 664–65; *Washington v. Victory Industrial Life Insurance Co. of Louisiana,* 146 So. 766 (La.App.1933).

■ Where the beneficiary's insurable interest is a debt allegedly owed by the insured, as is herein claimed, the amount of the life insurance at the time the policy was written and at the time of the insured's death must be proportionate to the debt actually owed by the insured; if the value of the life insurance is grossly disproportionate to the amount actually owed, the beneficiary lacks an insurable interest, and the policy is null and void. *Brown v. State Farm Fire & Casualty Company,* 363 So.2d 967 (La.App.1978); *Travia v. Metropolitan Life Insurance Co.,* 186 La. 934, 173 So. 721 (1937); *Bush v. Victory Industrial Life Insurance Co.,* 165 So. 486 (La. App.1936). Since we earlier held that Con-

nor was not indebted to plaintiff either when the policy was written or when he died, the amount of the insurance is grossly disproportionately to the amount of the debt. Even if we consider the amount that Connor could have owed under the terms of the partnership agreement—$2000—this too is far exceeded by the face value of the policy. Accordingly, we conclude that plaintiff lacks an insurable interest in the policy herein considered.

 Should we characterize the beneficiary's expectation as a pecuniary gain arising from his business partnership with the insured, rather than as a debt arising from their relationship,[4] our findings of fact lead to only one reasonable conclusion: that an expected pecuniary advantage of $240,000 in profits over 20 years derived from "TV Journal" is grossly disproportionate to the amount Connor could have paid plaintiff on a monthly basis given the inexperience of Connor and plaintiff and the vast undercapitalization of the venture. We therefore hold that plaintiff lacks an insurable interest under this theory too. *Goodwin, supra*, 180 So. at 664. See also *Morris v. Provident Life & Accident Insurance Co.*, 1978–1980 Life Cas. 1527 (Tenn.App.1980); *Lakin v. Postal Life & Casualty Insurance Co.*, 316 S.W.2d 542 (Mo.1958).

Because an insurable interest is required by law in order to protect the safety of the public by preventing anyone from acquiring a greater interest in another person's death than in this continued life, the parties cannot, even by solemn contract, create insurance without an insurable interest; further, the insurance company cannot waive or be estopped from asserting lack of insurable interest by its conduct in issuing the policy. *Goodwin, supra*, 180 So. at 665.

Considering the foregoing, we hold that the insurance policy from which plaintiff claims he is entitled to recover is null and void, and thus that his claim against defendant is hereby DISMISSED.

Accordingly, the clerk of court is directed to enter judgment in favor of defendant, the Mutual Life Insurance Company of New York, and against plaintiff, Alan M. Rubenstein, dismissing his claim at plaintiff's cost.

---

**4.** Since the policy herein is a credit life insurance policy and not a "key man" life insurance policy based on the partnership relationship between plaintiff and Connor, we need not consider whether plaintiff had an insurable interest arising from an expectation of pecuniary gain from the "TV Journal" partnership. We do so, however, for the purpose of making the record complete.