550 A.2d 677

L. Neal BEARD, et al.

v.

The AMERICAN AGENCY LIFE INSURANCE COMPANY, et al.

No. 9, Sept. Term, 1988.

Court of Appeals of Maryland.

Dec. 1, 1988.

---

236

238

Kenneth J. Mackley (Mackley, Gilbert & Marks, both on brief), Hagerstown (George W. Liebmann, George W. Liebmann, P.A., on brief), Baltimore, for petitioners.

William McClure Schildt (Strite, Schildt & Varner, on brief), Hagerstown, for respondents.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

Maryland Code (1957, 1986 Repl.Vol.) Art. 48A, § 366(a) requires that a person, who procures an insurance contract upon the life of another, have an "insurable interest" in the insured individual. This case focuses upon whether a tenant farmer, who leased his landlord's farm, and who possessed an oral option to purchase the farm, had an insurable interest in the life of the landlord under § 366(a).

## I.

In the spring of 1981, L. Neal Beard began farming approximately 150 acres of land in Washington County, which was owned by David E. Bachtell. In February 1982 Beard and Bachtell formalized their relationship by entering into a lease under which Beard undertook to cultivate the land and to keep the buildings, fences and other structures in good repair. Beard also agreed to indemnify Bachtell for any expenses, costs or losses resulting from his operation of the farm. The lease obligated Beard to pay Bachtell an annual cash rent of $7,800 in monthly installments of $650 each. Bachtell reserved the right to occupy and use the dwelling house, yard, garage, and a one-quarter acre plot.

The parties further agreed that the lease was to remain in effect for a term of one year with automatic renewals each year unless terminated by either party upon six months' notice prior to the beginning of the succeeding lease year. The lease provided that its terms were binding upon both Beard's and Bachtell's heirs and successors.

Shortly after he began farming the Bachtell property, Beard discussed with Bachtell the possibility of purchasing the farm after Bachtell's death. Because Bachtell's children were not interested in operating the farm, Bachtell was receptive to Beard's purchase offer. While the parties orally agreed on a purchase price of $400,000, Beard was uncertain that he could obtain the necessary financing for the transaction. Bachtell suggested that Beard might fund the purchase by obtaining an insurance policy on Bachtell's life. Bachtell indicated that he would not secure the policy nor pay any premiums on the policy.

Beard contacted an insurance agent, Ronald Snyder, and explained his and Bachtell's plan to fund the purchase of Bachtell's farm by obtaining insurance on Bachtell's life. Snyder provided Beard and Bachtell with applications for the purchase of insurance, which were signed by both Beard and Bachtell. Subsequently, Snyder arranged for Bachtell to be examined by Dr. Robert Campbell, a Hagerstown physician. Campbell submitted the results of this examination to Snyder for use in procuring the insurance.

In March 1982, Snyder contacted another insurance agent, Robert Zimmerman, who was affiliated with the American Agency Life Insurance Company (American), a company which accepted risks which other companies refused to underwrite. Zimmerman invited Snyder to meet with Tom Higgins, the chief underwriter for American to discuss the possibility of Beard insuring the life of Bachtell. The three men were aware that the law required the purchaser of life insurance to have an insurable interest in the insured individual. They reviewed the landlord-tenant relationship which existed between Beard and Bachtell, as well as Beard's option to purchase Bachtell's farm upon his

death. The underwriter suggested that "business partners" would be the best description to use in designating the type of insurable interest which Beard had in Bachtell. Higgins, Snyder and Zimmerman agreed that American would accept the risk and insure the life of Bachtell upon the receipt of a signed application and a check for the first year's premium of $12,855.

After receiving the premium check, the signed application, and the physical examination report, American promptly issued a policy in the face amount of $200,000 on the life of Bachtell with Beard named as the beneficiary and owner of the policy. In late April, American issued a second policy for an additional $200,000 based upon an application signed by Beard which indicated his relationship with Bachtell to be that of "business partner" and which was accompanied by a $3,833.00 premium check. This policy was converted to a policy for the same face amount but issued by the Life Insurance Company of Virginia (Virginia). Subsequently, Beard as owner and beneficiary procured additional insurance on Bachtell's life from two other insurance companies, but the proceeds from these policies are not at issue in this suit. Thus, Beard obtained a total of $1,000,000 in insurance coverage upon the life of Bachtell. As beneficiary of these policies, Beard planned to use the proceeds to purchase the farm and additional machinery, to construct improvements on the property, and to discharge his own farming debts.

In accordance with the lease, Beard operated the Bachtell farm from February 1982 until March 1984. During this time, Beard spent approximately $20,000 of his own money for improvements to the milking parlor, the silo, and the other dairy facilities. Beard filed income tax returns for the years 1981–1984 which designated his farm profit or loss as solely personal. During this period, no partnership returns were ever prepared by or on behalf of Beard or Bachtell. In March 1984, Beard ceased operating the Bachtell farm. By public sale, Beard sold all his machinery, feed

and other equipment. He also cancelled the lease with Bachtell's concurrence. Subsequently, on November 5, 1985, Bachtell died.

Following Bachtell's death, Beard's sister, Betty J. Monninger, brought suit in Circuit Court for Washington County against Beard and American; she claimed that she was owed one half of the insurance proceeds payable under the policies issued on Bachtell's life because she had supplied Beard with part of the funds which were used to pay the premiums on the insurance policies. American counter-claimed against Monninger and cross-claimed against Beard; it sought a judgment declaring that Beard had no insurable interest in Bachtell and that the policy was therefore null and void. Virginia intervened in the action, asserting claims and defenses similar to those made by American. American and Virginia thereafter moved for summary judgment. The trial court (Wright, J.) granted the motions, finding as a matter of law that Beard did not have an insurable interest in Bachtell's life. It found that the rights and duties created by the 1982 farm lease failed to establish a substantial economic interest on the part of Beard in having Bachtell's life continue and that the purchase option agreement for the farm, which was unwritten and therefore unenforceable, did not create such an interest. The court found no evidence that Bachtell was himself engaged in the business of farming with Beard or that Beard had a con-tract or option to purchase any business and hence there was no business partnership extant between Beard and Bachtell. In granting summary judgment, the court fur-ther held that the doctrines of waiver and estoppel were not applicable to the defense of lack of an insurable interest.

Beard appealed. The Court of Special Appeals affirmed the judgments in an unreported opinion, concluding that Beard did not have an insurable interest in Bachtell, that waiver and estoppel did not bar the insurer's defense of lack of insurable interest, and that the incontestability

clause contained in the policies did not apply. We granted certiorari to decide the significant issues raised in the case.

## II.

Under the common law, "[b]efore a person can validly procure insurance upon the life of another, he must have an insurable interest in that life." 2 J. Appleman, *Insurance Law and Practice* § 761, at 101 (1966). This rule is premised upon the view that contracts in which the procurer lacks an insurable interest in the insured are mere gambling contracts and as such are against the public interest; it rests " 'upon the theory that the public has an interest, independent of the consent and concurrence of the parties,' " in discouraging one party from wagering upon the life of another. *Interstate Life & Accident Co. v. Cook*, 19 Tenn.App. 290, 86 S.W.2d 887, 889 (1935), *quoting*, 1 Couch, Cyc. of Insurance Law, § 295, at 769–70. In light of the strong public interest which underlies the insurable interest doctrine, courts have held that " '[t]he parties to a contract of insurance cannot, even by solemn agreement, override the public policy which requires the beneficiary to have an insurable interest.' " *Id.* *See also Rubenstein v. Mutual Life Ins. Co. of New York*, 584 F.Supp. 272, 279 (E.D.La. 1984) ("[b]ecause an insurable interest is required by law in order to protect the safety of the public by preventing anyone from acquiring a greater interest in another person's death than in this continued life, the parties cannot, even by solemn contract, create insurance without an insurable interest").

The common law rule was first adopted in Maryland in *Rittler v. Smith*, 70 Md. 261, 16 A. 890 (1889); we there noted that "one who has no insurable interest in the life of another cannot insure that life." *Id.* at 263, 16 A. 890. In addition we recognized the general common law rule that if a person enters into a contract for insurance upon the life of another while lacking an insurable interest in that individual, the contract is a mere gambling contract which is

against public policy and void.[1] *Id.* *See also* Appleman, *supra,* § 761, at 102–03.

### A.

In 1956, the Legislature codified these common law principles when it enacted what is now Code, Art. 48A, § 366(a), which provides:

> "Any individual of competent legal capacity may procure or effect an insurance contract upon his own life or body for the benefit of any person. But no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his personal representatives, or to a person having, at the time when such contract was made, an insurable interest in the individual insured."

Although we have not previously interpreted § 366, the federal courts have considered this provision and found it to be consistent with the common law rules set forth in *Rittler. See National Life Insurance Co. v. Tower,* 251 F.Supp. 215, 221 (D.Md.1966), *aff'd in part, rev'd in part (other grounds) sub nom. Maryland National Bank v. Tower,* 374 F.2d 381 (4th Cir.1967).

While the courts and legislatures of this country, including those of Maryland, have generally agreed that an insurable interest is required for an individual to procure insurance upon the life of another, they have experienced some difficulty in determining what interest constitutes an insurable interest. The Maryland statute, § 366, provides in subsection (c) that an insurable interest includes only the following:

---

1. In *Rittler,* we observed that courts in other jurisdictions have found these contracts to be void "not simply because they tend to promote gambling, but because they are incentives to crime." 70 Md. at 263–64, 16 A. 890. We noted, however, that Maryland's insurable interest doctrine is based solely upon the public policy against encouraging gambling contracts, rejecting the argument that such contracts are void because they may be incentives to crime.

"(1) In the case of individuals related closely by blood or by law, a substantial interest engendered by love and affection.

(2) In the case of other persons, a lawful and substantial economic interest in having the life, health, or bodily safety of the individual insured continue, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the individual insured.

(3) An individual heretofore or hereafter party to a contract or option for the purchase or sale of an interest in a business partnership or firm, or of shares of stock of a closed corporation or of an interest in such shares, has an insurable interest in the life of each individual party to such contract and for the purposes of such contract only, in addition to any insurable interest which may otherwise exist as to the life of such individual."

Section 366(c)'s definition of an insurable interest is consistent with that formulated by the courts under the common law. *See, e.g., Warnock v. Davis,* 104 U.S. 775, 779, 26 L.Ed. 924 (1882) ("[i]t may be stated generally ... to be such an interest, arising from the relations of the party obtaining the insurance, either as creditor of or surety for the assured, or from the ties of blood or marriage to him, as will justify a reasonable expectation of advantage or benefit from the continuance of his life.... there must be a reasonable ground, founded upon the relations of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the assured"); *Rubenstein, supra,* 584 F.Supp. at 278 (defining insurable interest as existing where there are ties of blood or marriage or where the beneficiary "has a reasonable expectation of pecuniary gain from the continued life of the insured, or reasonable expectation of sustaining loss from his death"); *Drane v. Jefferson Standard Life Ins. Co.,* 139 Tex. 101, 161 S.W.2d 1057, 1058–59 (1942) (defining the three general classes of individuals having an insurable interest in another as "(1) one so closely related

by blood or affinity that he wants the other to continue to live, irrespective of monetary considerations; (2) a creditor, and (3) one having a reasonable expectation of pecuniary benefit or advantage from the continued life of another") (citations omitted); G. Couch, *Couch on Insurance* § 24:120, at 208–09 (2d ed. 1984) ("[a] person has an insurable interest in the life of another if he can reasonably expect to receive pecuniary gain from the continued life of the other person and conversely, if he would suffer financial loss from the latter's death").

Beard concedes that he does not have an insurable interest in Bachtell of the type described in § 366(c)(1) which requires an individual to share ties of blood or affection with the insured. Thus, Beard had to establish an insurable interest of the type defined in either subsection (c)(2) or (3) of § 366. In this regard, as the trial court granted summary judgment against Beard, we must view the record in a light most favorable to Beard. *See* Maryland Rule 2–501; *Berkey v. Delia,* 287 Md. 302, 413 A.2d 170 (1980). Drawing all inferences in favor of Beard, we nevertheless conclude for reasons hereafter stated that, as a matter of law, Beard failed to establish an insurable interest in Bachtell's life.

■ As already observed, § 366(c)(2) requires a person to have a substantial economic interest in having the life of the individual insured continue, rather than an interest which would become more valuable as a result of the insured's death. The Texas Supreme Court in *Drane, supra,* provided a more definitive explanation of what is meant by an insurable interest which is derived from a reasonable expectation of pecuniary benefit or advantage from the continued life of another. It said that it is an interest determined by monetary considerations, viewed from the standpoint of the beneficiary—would the beneficiary regard himself as better off from the standpoint of money, would he enjoy more substantial economic returns should the insured continue to live, or would he have more

in the form of the proceeds of the policy should the insured die. 161 S.W.2d at 1059.

Applying this concept, Beard would enjoy a more substantial economic return from the death of Bachtell. He would not receive any particular economic benefit from Bachtell's continued life; at best, he would remain a tenant on the farm, owing Bachtell a monthly rental, and holding an oral option to purchase the farm upon Bachtell's death. Only upon Bachtell's death would Beard gain an economic benefit from their relationship for then Beard could claim $1,000,-000 in insurance proceeds.

While *Drane* provides a useful test for determining the existence of an insurable interest, such an interest is not measured solely by comparing the benefit which the beneficiary receives from the insured's continued life with that realized upon the insured's death. As the court recognized in *Cooper's Adm'r v. Lebus' Adm'rs*, 262 Ky. 245, 90 S.W.2d 33 (1935), whether an individual has an insurable interest in another also may be determined by examining the " 'loss or disadvantage [which] will naturally and probably arise, to the party in whose favor the policy is written, from the death of the person whose life is insured.' " *Id.* 90 S.W.2d at 36, *quoting, Adams' Adm'r v. Reed*, 18 Ky.L. Rptr. 858, 38 S.W. 420, 422 (App.1896).

Beard claims that he will suffer a substantial loss from Bachtell's death because he has expended capital funds on improving the farm and might have to leave the farm if Bachtell's heirs choose to terminate the lease or sell the property. Beard, however, would run a like risk of loss even if Bachtell continued to live since under the terms of the lease, Bachtell could have cancelled the lease upon six months' notice.

Moreover, nothing in the record discloses that Beard would have suffered any loss directly as a result of Bachtell's death. As the lease was binding upon Bachtell's heirs and successors, they would have the same rights and would owe Beard the same obligations as would Bachtell himself.

Thus, Beard would have the same interest and rights in the property and the same relationship with its owner whether Bachtell lived or died. Therefore, we think the trial court correctly concluded, as a matter of law, that Beard failed to establish a special loss resulting from Bachtell's death which would warrant a finding that he had an insurable interest in Bachtell's life.

Because the lease was binding upon Bachtell's heirs, the present case is distinguishable from those cases, relied upon by Beard, in which the beneficiary holds property subject to a life estate in the insured. *See, e.g., Sides v. Knickerbocker Life Ins. Co.,* 16 F. 650 (C.C.W.D.Tenn.1883) (holding that tenant farmer who leased property from owner with life estate interest in property had an insurable interest in the life of the owner); *De Long's Adm'r v. Arnold,* 306 Ky. 290, 206 S.W.2d 928 (1947) (holding that beneficiary who held property during the life of the insured possessed an insurable interest in the insured); *see also Empire Life Ins. Co. of America v. Moody,* 584 S.W.2d 855 (Tex.1979) (holding that assignee of trust beneficiary's life income had an insurable interest in the life of the trust beneficiary). In these cases, the beneficiary held the property only so long as the owner of the life estate remained alive so that the beneficiary's interest in the property ended automatically upon the death of the owner. Thus, in each of these cases, the duration of the beneficiary's estate was determined by the death of the owner and the beneficiary's interest was therefore tied directly to the life of the owner. Consequently, in these cases, the beneficiaries had a substantial economic interest in having the life of the owner continue.

■ Beard failed to demonstrate an insurable interest under § 366(c)(3). This subsection provides that "a party to a contract or option for the purchase or sale of an interest in a business partnership or firm ... has an insurable interest in the life of each individual party to such contract and for the purposes of such contract only, in addition to any insurable interest which may otherwise exist as to the life of such individual." Beard argues that his lease and

option to purchase Bachtell's farm gave rise to the type of insurable interest which exists when two parties have "a contract or option for the purchase . . . of an interest in a business partnership or firm." *Id.* Assuming arguendo that a farm operation may constitute a business,[2] to be within § 366(c)(3), Beard had to establish that under his contracts with Bachtell, he was acquiring an interest in a business partnership or firm.

For the proposition that an individually owned farm may be a "firm," Beard relies upon *State v. Case*, 132 Md. 269, 103 A. 569 (1918). In that case, referring to the provisions of a Maryland statute, we noted that ordinarily " '[t]he singular always includes the plural, and *vice versa*, except where such construction would be unreasonable.' " *Id.* at 273, 103 A. 569, *quoting*, Section 7 of Article 1 of the Maryland Code. Based on this statute, the Court concluded that "[t]he word 'firms,' as used in the title [of a statute regulating 'Construction Firms or Companies'], is the plural of 'person' and, under the rule, includes it, if to so construe it is not unreasonable." *Id.* at 273, 103 A. 569. However, this definition of "firm" is hardly the only definition of the word. In *McCosker v. Banks*, 84 Md. 292, 35 A. 935 (1896) we said that "[t]he word firm is equivalent to partnership and signifies the name under which any house of trade is established or conducts business." *Id.* at 294, 35 A. 935. In the present case where the statute at issue uses the word "firm" in the conjunctive with the word partnership, it is more reasonable to use the definition given in *McCosker* and to construe the word "firm" as meaning a partnership rather than an individual. Thus, we conclude that the word "firm" as used in § 366(c)(3) refers to a business or trade which is operated by two or more individuals and which is in the nature of a partnership.

---

**2.** *See* Code (1975, 1985 Repl.Vol.) § 9–101(c) of the Corporations and Associations Article (defining a business as including "every trade, occupation, or profession").

■ It is thus not sufficient for Beard to show that his oral option to purchase Bachtell's farm (even assuming its legality) was an option to purchase an individually owned business. Instead, to establish an insurable interest of the type defined in § 366(c)(3), it was requisite for Beard to show that his option to purchase Bachtell's farm constituted an option to purchase a business partnership.

■ Generally, the burden of proving a partnership is on the one who alleges its existence, *M. Lit, Inc. v. Berger,* 225 Md. 241, 247, 170 A.2d 303 (1961) and depends upon the intention of the parties, *Miller v. Salabes,* 225 Md. 53, 55, 169 A.2d 671 (1961). Ordinarily, the parties' intention is proved by their expressed agreement, or inferred from their acts and conduct as disclosed by all of their transactions. *Id.* at 55–56, 169 A.2d 671. We have held that the relationship of landlord and tenant under an agreement for the lease of a farm does not result in the creation of a partnership. *Tomlinson v. Dille,* 147 Md. 161, 164–65, 127 A. 746 (1925). *See also Cline v. Fountain, Etc., Company,* 214 Md. 251, 257, 134 A.2d 304 (1957) (noting that "the receipt by a person of a share of the profits of a business is *prima facie* evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment of rent to a landlord"; and concluding that "the same rule should apply to a landlord receiving a share of the profits as rent when a joint adventure is claimed to exist as when a partnership is claimed to exist"); Code (1975, 1985 Repl.Vol.) § 9–201(4) of the Corporations and Associations Article (stating that "[t]he receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if the profits were received in payment ... as ... rent to a landlord"). This rule applies even where the parties agree that the landlord shall receive a share of the farm's profits in place of rent or in addition to a specified rent. *Tomlinson, supra,* 147 Md. at 164–65, 127 A. 746.

■■■ As found by the trial judge, the record is devoid of any evidence that Beard and Bachtell intended to create a partnership or in fact operated the Bachtell farm as partners. As earlier stated, neither Beard nor Bachtell reported any partnership income on their tax returns during the years 1981–84 when Beard leased the farm from Bachtell. No partnership returns were ever prepared by or on behalf of Beard or Bachtell, and Beard filed income tax returns during this period which reported his profits and losses from the farm operation as being solely personal. The only written expression of Beard's and Bachtell's intent with respect to the farm is contained in the lease agreement which described their relationship as landlord and tenant, rather than business partners. We thus conclude that the mere farm rental agreement executed by the parties is insufficient to establish a partnership relationship. Therefore, because no partnership relationship existed between Beard and Bachtell, Beard did not have an insurable interest in Bachtell's life under § 366(c)(3).

■■ Even if a partnership existed between Beard and Bachtell, this finding alone would not establish that Beard had an insurable interest in his landlord's life. In providing that an insurable interest exists where one party insures the life of another individual with whom the party has a contract or option to purchase an interest in a business partnership or firm, § 366(c)(3) is in accord with the common law rule that ordinarily a partner has a pecuniary interest in the continuance of the partnership and therefore has an insurable interest in the life of the co-partner. *See Connecticut Mut. Life Ins. Co. v. Luchs,* 108 U.S. 498, 505–06, 2 S.Ct. 949, 27 L.Ed. 800 (1883). Nevertheless, in some cases, "a partner's expectation of benefit or advantage could lie not in the continuance of the lives of his partners but rather in the possibility of their deaths prior to his own." *Block v. Mylish,* 351 Pa. 611, 41 A.2d 731, 735 (1945). Consequently, courts have held that "[t]he mere existence of a legal partnership does not establish an insurable interest." *Sun Life Assur. Co. of Canada v. Allen,*

270 Mich. 272, 259 N.W. 281, 283 (1935). *See also Rubenstein, supra,* 584 F.Supp. at 279; *Lakin v. Postal Life and Casualty Insurance Co.,* 316 S.W.2d 542, 550 (Mo.1958) (per curiam); *Powell v. Mutual Ben. Life Ins. Co.,* 123 N.C. 103, 31 S.E. 381, 381 (1898). As the court explained in *Lakin, supra:*

> "While it is true that partners usually, and perhaps in most cases, have an insurable interest in the life of a copartner, it is the existence of circumstances which arise out of or by reason of the partnership, and not the mere existence of the partnership itself, that give rise to an insurable interest. The legal relationship of one partner to the other does not, and should not, necessarily create an insurable interest as does the relationship of husband and wife." 316 S.W.2d at 550.

Thus, the court concluded that "[t]he better rule, and the one based on sound reasoning, is that an insurable interest does not necessarily arise by virtue of the mere partner relationship alone" and that the court must "look to the circumstances arising out of or by reason of the partnership to determine whether an insurable interest exist[s]." *Id.* at 551.

Generally, courts have cited several factors as influential in determining whether in a particular case a partnership relationship is of the type which would give rise to an insurable interest among the partners. Specifically, courts consider whether the insured partner has made or was obligated to make a financial or capital contribution, whether the insured had any technical knowledge, skill or ability to contribute to the partnership, whether the insured had any experience in the type of work he was to do or in the business of the alleged partnership, whether the beneficiary had any legal claim for the insured's continued services, whether the insured purchased or acquired an interest in the business or the tools and equipment used in the business, and whether the insured brought or could be expected to bring any business to the partnership. *Lakin, supra,* 316 S.W.2d at 551.

There is nothing in the record before us to indicate that Bachtell made any financial or capital contribution to Beard's operation of the farm. Bachtell did not contribute his land to the farming operation; rather he leased his property to Beard and in return received a fair rental value. He did not participate personally in the operation of the farm and thus did not add any special experience, knowledge or skill to Beard's endeavors, nor did Beard have any legal claim for Bachtell's services. In fact, the record indicates that because of Bachtell's age and physical infirmities, he was unable to aid in the operation of the farm. During Beard's occupancy, Bachtell did not purchase any equipment or contribute any money towards the improvements made to the farm. Instead, Beard financed these purchases and improvements alone. Finally, there is nothing to indicate that Bachtell "brought or could be expected to bring any business to the partnership, or that his presence as a partner increased or favorably affected the partnership." *Lakin, supra,* 316 S.W.2d at 551. In other words, there is no evidence to indicate that Bachtell's contributions to the operation of the farm were so substantial that Beard would have benefited more from Bachtell's continued life than from receiving the insurance proceeds upon Bachtell's death. There is simply no evidence which would establish that the relationship between Beard and Bachtell constituted the type of partnership which would give rise to an insurable interest among the partners.

█ In so concluding, we note Beard's reliance upon cases holding that an insurable interest exists where parties who were not partners operated businesses which were so intertwined that one party would suffer a substantial economic loss as a result of the death of the other. *See, e.g., Hulme v. Springfield Life Ins. Co.,* 565 P.2d 666 (Okl.1977); *Poland v. Fisher's Estate,* 329 S.W.2d 768 (Mo.1959). In these cases, the parties worked closely together, sharing their work facilities, information, equipment, and expertise, and would suffer a substantial economic loss from the death of their business associate.

There is no evidence that Beard's operation of the farm was in any way intertwined with or dependent upon the continued life of Bachtell. Bachtell did not provide Beard with any expertise or physical labor. The equipment used in operating the farm was supplied primarily by Beard. Beard made various decisions regarding the purchase and sale of livestock, supplies and machinery without the advice or consent of Bachtell. In short, Beard's operation of the farm was not intertwined with or dependent upon the continued life of Bachtell. Unlike the parties in *Hulme* and *Poland*, Bachtell's death had no direct economic effect upon Beard's ability to operate the farm.

## B.

As Beard lacked an insurable interest in Bachtell as required by § 366, we next consider whether the insurance contracts which Beard executed with American and Virginia are void and unenforceable. At common law, courts regularly held that contracts for life insurance in which the beneficiary lacked an insurable interest in the insured were illegal and void. *Rittler, supra,* 70 Md. at 263, 16 A. 890; Appleman, *supra,* § 761, at 101–04. Courts have found these contracts to be void because they encourage wagering upon the lives of others and in this respect are against public policy. This determination is in accord with our own finding that "[p]ublic policy ... lies at the basis of the law in regard to illegal contracts, and the rule is adopted not for the benefit of parties but of the public." *Lester v. Howard Bank,* 33 Md. 558, 562 (1871).

Section 366 does not expressly indicate whether a contract which violates the statute for lack of an insurable interest is void, although under the common law of Maryland such an insurance contract is void.[3] Generally, "con-

---

3. The statute only specifies the sanction to be imposed when a beneficiary who lacks an insurable interest receives payment of the insurance proceeds from the insurer. In these cases, the statute provides that "[i]f the beneficiary, assignee, or other payee under any contract

tracts made in contravention of statutory law are void." *Lester v. Howard Bank, supra,* 33 Md. at 564. *See also Queen v. Agger,* 287 Md. 342, 346, 412 A.2d 733 (1980) ("[c]ontracts which violate statutes will not be enforced"); *Patton v. Graves,* 244 Md. 528, 532, 224 A.2d 411 (1966) ("where the contract which the plaintiff seeks to enforce is expressly or by implication forbidden by the statute, no Court will lend its assistance to give it effect"). Nevertheless, as we noted in *Lester,*

> " 'before the rule can be applied in any case of a statute prohibiting or enjoining things to be done, with a prohibition and a penalty only for doing a thing which it forbids, ... the statute must be examined as a whole to find out whether or not the makers of it meant that a contract in contravention of it should be void, or that it was not so to be. In other words, whatever may be the structure of the statute in respect to prohibition and penalty, or penalty alone, that it is not to be taken as granted that the Legislature meant that contracts in contravention of it were to be void, in the sense that they were not to be enforced in a court of justice.' " 33 Md. at 564, *quoting, Harris v. Runnels,* 12 How. 80, 13 L.Ed. 901.

The Court added, however, that where the legislative intent is uncertain or cannot be determined and " 'when the statute is silent and contains nothing from which the contrary can be properly inferred, a contract in contravention of it is void.' " *Id.* 33 Md. at 565.

---

made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement, or injury of the individual insured, the individual insured or his executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them." Section 366(b). *See also Maryland National Bank v. Tower,* 374 F.2d 381 (4th Cir.1967) (wherein the court, applying Section 366(b), held that where an employer's pension plan trustee procured duplicate coverage upon an employee, the personal representative of the employee was entitled to the proceeds which were in excess of the trust fund's insurable interest in the employee). Section 366, however, does not specify what sanctions are to be imposed when, as here, the insurer has not yet paid a beneficiary who lacks an insurable interest.

Having found no legislative intent to the contrary, and in light of the common law rule which holds that contracts in which the beneficiary lacks an insurable interest are void, we conclude that Beard's contracts with American and Virginia violated § 366 and are therefore without effect.

## III

Beard also argues that even if he lacked an insurable interest in Bachtell's life, American and Virginia are nevertheless barred from raising this defense by the doctrines of waiver and estoppel. We disagree. The majority of courts hold that the doctrines of waiver and estoppel do not bar the insurer from raising this defense. *See, e.g., Rubenstein, supra,* 584 F.Supp. at 279 ("the insurance company cannot waive or be estopped from asserting lack of insurable interest by its conduct in issuing the policy"); *Brewton v. Ala. Farm Bureau Mut. Cas. Ins.,* 474 So.2d 1120, 1123 (Ala.1985) ("[h]aving found that ... no insurable interest in the premises, we conclude that the doctrines of waiver or estoppel do not apply"); *Farm Bur. Mut. Ins. Co. of Ark. v. Glover,* 2 Ark.App. 79, 616 S.W.2d 755, 757 (1981) ("in view of the strong public policy against enforcing insurance contracts in which there is no insurable interest involved, the doctrines of waiver and estoppel are completely inapplicable to create coverage which otherwise does not exist under the policy or to place therein a risk expressly excluded from the policy"); *Bell v. National Life and Accident Insurance Co.,* 41 Ala.App. 94, 123 So.2d 598, 601–02 (1960) (having found that "a contract of life insurance issued to one who has no insurable interest in the life of the insured is void ab initio," the court concluded that "the doctrine of estoppel will not apply to make enforceable that which is illegal and void in its inception"); *Home Life Ins. Co. v. Masterson,* 180 Ark. 170, 21 S.W.2d 414, 417 (1929) (having found an insurance policy in which the beneficiary lacked an insurable interest to be against public policy and void, the court concluded that "[s]ince it is the law which, upon grounds of public policy, pronounces the policy to be void,

the doctrine of estoppel has no application"); Couch, *supra*, § 24:9, at 26–27 ("[i]n many jurisdictions the rule prevails that where a life insurance policy is void at its inception because of lack of an insurable interest in the beneficiary, it cannot be rendered valid or enforceable by waiver or estoppel").

Those courts which have refused to apply the doctrines of waiver and estoppel to the insurable interest defense have based their decisions primarily upon the underlying purpose of the insurable interest rule. As Couch explains in his treatise on insurance law:

"If an insurable interest is considered a requirement based on demands of public policy, the logical and practically unavoidable conclusion is that the theory of estoppel or waiver can never be employed to give legal enforceability to a contract absolutely void. If, however, such requirement is viewed as primarily intended to protect the insurer, estoppel and waiver can be effectively used to overcome the defense of lack of insurable interest." Couch, *supra*, § 24:9, at 26.

■■■ In *Rittler*, we indicated that at common law in Maryland the insurable interest requirement was based upon society's interest in discouraging contracts in which an individual wagers upon the life of another. 70 Md. at 263–64, 16 A. 890. We gave no indication in that case that our decision was in any way motivated by a desire to protect insurers from overreaching beneficiaries. Consequently, we hold that the insurable interest doctrine in this state is based upon the demands of public policy rather than an interest in protecting the providers of insurance.

■■■ The subsequent codification of the insurable interest doctrine in § 366 gives no indication that the legislature intended to change this underlying purpose. Consequently, the public interest is of paramount importance and overrides the equitable doctrines of waiver and estoppel.

Our conclusion is supported by an examination of the general definitions of waiver and estoppel, defined by Appleman, *supra,* § 9081 at 489, 491–92, as follows:

" 'Waiver' is the voluntary, intentional relinquishment of a known right. Such waiver may result either from affirmative acts of the insurer or its authorized representatives, or its nonaction with knowledge of the facts....

....

" 'Estoppel', on the other hand, refers to an abatement raised by law of rights and privileges of the insurer where it would be inequitable to permit their assertion. It necessarily implies prejudicial reliance of the insured upon some act, conduct, or nonaction of the insurer."

Generally, waiver applies in cases where particular terms, conditions, limitations, or other provisions of the insurance contract are at issue. *Id.* at § 9083. In contrast, estoppel is an equitable doctrine which is applied when the insurer is accused of fraud or misrepresentation. *Id.* at § 9088. As these definitions indicate, when either waiver or estoppel is applied, the courts proceed on the theory that there is a presumptively valid contract between the parties which is objectionable due to some defect in the bargaining process or in the contract itself. With respect to the defense of insurable interest, however, waiver and estoppel do not apply because there is no presumptively valid contract upon which these two doctrines can operate as an insurance contract, without an insurable interest, is against public policy and void ab initio. As Couch explains:

"Policies which are wagers, because the persons who procure the same have no insurable interest, will not be enforced, even though the insurer had knowledge of the facts at the time of issue, since it cannot estop itself to plead no insurable interest, for the reason that the court will not aid either party in enforcing a contract which is void as against public policy. The mere knowledge upon the part of the insurer, or its authorized agent, of lack of insurable interest, does not relieve the insured from establishing such an interest, as a condition precedent to

recovery on the policy, since the doctrine of waiver cannot apply, for an insurance company cannot be held to a contract of insurance on the principle of waiver, where it could not make such a contract in the first instance." Couch, *supra,* § 24:9, at 27–28.

As Beard did not have an insurable interest in Bachtell, his contracts with American and Virginia were against public policy and void ab initio; thus the doctrines of waiver and estoppel do not apply and are not a bar to the insurable interest defense.

## IV.

 Finally, Beard contends that the incontestability clause of the insurance contracts bars American and Virginia from raising the defense of lack of insurable interest.[4] Under the common law, an incontestable clause in an insurance contract does not bar the defense of lack of insurable interest. *See, e.g., Carter v. Continental Life Ins. Co.,* 115 F.2d 947, 948 (D.C.Cir.1940) ("it is well settled that the incontestable clause does not prevent the insurer from asserting this defense [lack of insurable interest]"); *Commonwealth Life Ins. Co. v. George,* 248 Ala. 649, 28 So.2d 910, 914 (1947) ("the decided weight of authority, and sound reasoning as well, support the view that the incontestable clause furnishes no answer to the defense that the plaintiff was without insurable interest"); *Wharton v. Home Security Life Ins. Co.,* 206 N.C. 254, 173 S.E. 338, 339 (1934) (holding that the parties to a contract, which is void on the grounds that the beneficiary lacked an insurable interest, cannot bind themselves by an incontestability clause in the contract because such a result would "deprive the courts of the power to enforce the public policy of the state by their

---

**4.** The policies at issue in the present case contained the following provision concerning incontestability:

"INCONTESTABILITY. After this policy has been in force during the lifetime of the insured for two years from the issue date we cannot contest it except for non-payment of premiums when due. This paragraph does not apply to any benefits payable under any disability or accidental death rider."

judgments"); *Home Life Ins. Co. v. Masterson, supra,* 21
S.W.2d at 417 ("a policy of life insurance, void because
contrary to public policy as a wagering contract, was not
rendered actionable by an incontestable clause"); *Brom-
ley's Adm'r v. Washington Life Ins. Co.,* 122 Ky. 402, 92
S.W. 17, 18 (1906) (having determined that the beneficiary
lacked an insurable interest in the insured, the court con-
cluded that "[t]he parties to an illegal contract cannot by
stipulating that it shall be incontestable, tie the hands of the
court and compel it to enforce contracts which are illegal
and void"); Appleman, *supra,* § 764, at 126 ("[t]he defense
of lack of insurable interest is not, however, barred by the
operation of the incontestable clause"); Couch, *supra,*
§ 72:87, at 349 ("the insurer, notwithstanding an incontesta-
ble clause, is entitled, after the expiration of the contestable
period, to defend on the ground of want of insurable inter-
est, if the policy otherwise would have been void on that
ground").

In *Bromley's Adm'r v. Washington Life Ins. Co., supra,*
the Kentucky Court of Appeals explained the rationale
behind the rule that an incontestability clause does not bar
the lack of insurable interest defense:

> "If the contract is against public policy the court will not
> lend its aid to its enforcement. The defense need not be
> pleaded. If at any time it appears in the process of the
> action that the contract sued upon is one which the law
> forbids, the court will refuse relief. The parties to an
> illegal contract cannot by stipulating that it shall be
> incontestable, tie the hands of the court and compel it to
> enforce contracts which are illegal and void. If this were
> allowed, then the law might be evaded in all cases and the
> aid of the court might be secured in aid of its infraction."
> 92 S.W. at 18.

This reasoning is in accord with other decisions which do
not involve the lack of the insurable interest defense, but
which nevertheless hold that "[t]he invocation of an incon-
testability provision presupposes a basically valid contract"
and thus "[i]ncontestability does not apply to a policy which

is void *ab initio." Crump v. Northwestern National Life Insurance Company*, 236 Cal.App.2d 149, 45 Cal.Rptr. 814, 819 (1965). *See also Tulipano v. U.S. Life Ins. Co. in City of New York*, 57 N.J.Super. 269, 154 A.2d 645, 650 (1959) ("it has generally been held that an insurance policy violative of public policy or good morals cannot be enforced simply because the incontestability period has run").

Beard argues that the present case can be distinguished from these cases because Maryland has a statute which requires that all life insurance policies contain an incontestability clause. That statute, Article 48A, § 390, provides:

> "There shall be a provision that the policy (exclusive of provisions relating to disability benefits or to additional benefits in the event of death by accident or accidental means) shall be incontestable, except for nonpayment of premiums, after it has been in force during the lifetime of the insured for a period of two (2) years from its date of issue."

Beard contends that this statutory requirement of incontestability overrides the public policy interests which underlie the insurable interest doctrine. In support of his contention, Beard cites in particular *Bogacki v. Great–West Life Assur. Co.*, 253 Mich. 253, 234 N.W. 865 (1931). There, the court found that in enacting a statute which required that all life insurance policies contain an incontestability clause, the Michigan legislature had established a strong public policy in favor of incontestability. 234 N.W. at 866. The insurer argued that the public policy behind the insurable interest doctrine outweighed the interests which underlay the incontestability requirement and that the court should continue to apply the common law rule which permitted an insurer to plead lack of insurable interest as a defense after the running of the incontestability period. The court, however, noted that the statute specified the only permissible exceptions to its operation. *Id.* Because the defense of lack of insurable interest was not among these exceptions, the court concluded that an incontestability clause could operate as a bar to this defense. *Id.* 234 N.W. at 866. *See*

*also Sun Life Assur. Co. of Canada v. Allen, supra,* 259 N.W. at 284 (in which the court reaffirmed its earlier holding in *Bogacki* ).

We think *Bogacki* distinguishable. Although § 390 of Article 48A is similar to the Michigan statute involved in *Bogacki,* Maryland, unlike Michigan, also has a statute which requires that one who procures insurance on the life of another have an insurable interest in that individual. Thus, in Maryland, the legislature, by codifying the common law insurable interest doctrine, has indicated that there is a strong public policy underlying this doctrine as well.

Although we are unaware of any cases where a state has both a statutory incontestability requirement and a statutory insurable interest requirement, courts in other jurisdictions have held that when a statutory incontestability requirement comes into conflict with another statutory requirement, the incontestability requirement may be defeated. For example, in *Guarantee Trust Life Ins. Co. v. Wood,* 631 F.Supp. 15 (N.D.Ga.1984), the court addressed the issue whether an insurer was barred by the incontestability clause contained in two life insurance policies from arguing that the policies were void *ab initio* because the proposed insured neither signed the applications nor consented in writing to the issuance of the coverage. Two statutes governed the court's decision. One required that all life insurance policies contain an incontestability clause and the other provided that no life insurance policy be made or effectuated unless at the time of the making the insured applied for the life insurance contract or consented to the contract in writing. The insurer argued that because the insured had never applied for the coverage nor consented thereto in writing the policies were void ab initio and unenforceable. The beneficiary maintained that while the policies may have been void ab initio, the incontestability clause contained in the policies in accordance with the statutory requirement prevented the insurer from raising the defense of lack of consent. The court rejected the beneficiary's argument, finding that the insured had not

applied for or consented to the policies and thus the policies were "void *ab initio* and unenforceable notwithstanding the incontestability clauses in light of the strong public policy behind ... [the statute requiring the consent of the insured] to protect the individual insured as well as the general public from physical danger and fraudulent claims." *Id.* at 19. The court reasoned that

> "[w]hile the purpose of the incontestability clause may be to protect the rights of beneficiaries and persons claiming under insurance policies, as well as the rights of the insured from expensive litigation, the Court cannot ignore the specific mandate of and overriding policy expressed by the Georgia Legislature to protect the public from physical danger and fraudulent insurance claims by requiring individuals insured to apply for or consent in writing to issuance of insurance." *Id.*

Like the court in *Wood,* we are confronted with two statutes with seemingly conflicting underlying public policies. We conclude that while the incontestability statute serves the substantial public interest in protecting claimants from the possibility of expensive litigation, the public policy behind the statutory requirement that the procurer of insurance have an insurable interest in the insured is an even more compelling goal. Consequently, having found that Beard lacked an insurable interest, as required by § 366 and that the contracts for insurance with American and Virginia were void ab initio, we hold that the incontestability clause does not apply in this case and is not a bar to the lack of an insurable interest defense.

JUDGMENTS AFFIRMED, WITH COSTS.